# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

LAWRENCE JOEY SMITH,

      Petitioner,

-vs-                                    Case No.   8:13-cv-2260-T-36AEP

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

Petitioner, a Florida prisoner, initiated this action by filing a petition for habeas corpus relief pursuant to 28 U.S.C. Section 2254 (Doc. 1), and a memorandum in support (Doc. 2). Upon consideration, the Court ordered Respondent to show cause why the relief sought in the petition should not be granted (Doc. 6). Thereafter, Respondent filed a response to the petition (Doc. 21), to which Petitioner replied (Doc. 30). For the reasons set forth below, the petition will be denied.

Petitioner alleges six grounds for relief:

1.      The trial court lacked jurisdiction to try, convict, and sentence Petitioner because the Indictment was not drafted, signed, and filed by a qualified assistant state attorney;

2a-j.   Defense counsel was ineffective in failing to:

      a. effectively cross examine State witnesses Theodore Butterfield and Heath Brittingham;

      b. elicit key testimony from the surviving victim Stephen Tuttle;

      c. impeach witnesses Bryon Loucks and Ken Shook;

d. adequately investigate the case and present available evidence;

e. obtain Butterfield and Brittingham's grand jury testimony;

f. object to Tuttle's testimony that Petitioner's co-defendant Faunce Pearce committed a sexual battery on Tuttle;

g. object to the prosecutor's improper argument;

h. adequately argue against the trial court's sustaining the State's objection to defense counsel impeaching Butterfield by questioning him as to why he failed to mention in his prior statements to law enforcement that Pearce and Petitioner switched guns prior to the shootings;

i. present an alternate defense theory that Butterfield shot the victims; and

j. move to dismiss the Indictment because it was not drafted, signed, and filed by a qualified assistant state attorney;

2k.  The cumulative effect of defense counsel's errors deprived Petitioner a fair trial;

3.  The State committed *Brady* and *Giglio* violations in failing to disclose the deal it made with Butterfield in exchange for his testimony, in allowing him to testify that he had no incentive to testify for the State, and arguing to the jury that he had no reason to testify falsely;

4.  Newly discovered evidence casts doubt on his guilt and warrants a new trial;

5.  The trial court was without jurisdiction because the jury panel took an oath before a person who was not qualified to administer an oath; and

6.  He was denied a fair trial because the trial judge was not present when the jury panel took its oath.

## I. FACTS[1]

On the evening of September 13, 1999, Faunce Pearce visited Bryon Loucks at Loucks' home, which was also his place of business, and asked Loucks' teenage stepson, Ken Shook, to obtain for him a book of 1000 geltabs (LSD) for $1200.  Shook called two friends, Stephen

---

[1] This summary of facts is taken from the Florida Supreme Court's opinion affirming Petitioner's convictions and sentence of life imprisonment for attempted first-degree murder and remanding to the circuit court for resentencing for the first-degree murder conviction.  *Smith v. State*, 866 So. 2d 51, 53 (Fla. 2004)

Tuttle and Robert Crawford, who in turn called another friend, Amanda Havner. Havner contacted her source for drugs, Tanya Barcomb, who said she could obtain the geltabs. Tuttle, Crawford, and Havner then went to Loucks' home, where Pearce gave them the money and indicated that they should not return without either the money or the drugs. The four teenagers went to Barcomb's house, where Barcomb indicated that she, her boyfriend, and Havner would obtain the drugs from a supplier while the boys remained behind. After arriving at an apartment complex, Barcomb told Havner to stay in the car. Barcomb and her boyfriend then entered a friend's apartment, and her boyfriend hid the money in his own shoe after punching himself in the face. When they returned to the car, they told Havner that the supplier had stolen the money. Because of Barcomb's deception, Shook, Tuttle, Crawford, and Havner eventually were forced to return to Loucks' home without either the money or the drugs.

While the teenagers were gone, Pearce and Loucks learned by telephone that the money had been stolen. Pearce became very angry and was standing outside with a gun visibly tucked in his pants when they returned shortly thereafter. As Shook, Tuttle, Crawford and Havner exited the car, Pearce waved the gun and ordered them inside the office of Loucks' business. Loucks and the four teenagers remained confined there by Pearce for an unknown period, during which Pearce's mood swung between calm and threatening. Pearce refused to allow anyone to leave and, at various times, waved his gun. At one point, he grabbed Havner by the throat and slammed her head against a wall. At another, he took Tuttle outside and forced him at gunpoint to perform oral sex upon him.

Eventually, Pearce allowed Havner to leave. Around that time, Pearce also called a friend, Theodore Butterfield, and asked Butterfield to bring Smith, the defendant in this case, and come to Loucks' home. Many neighbors were at the house where Butterfield received the call,

including Heath Brittingham, who agreed to join Butterfield. When Smith, Butterfield and Brittingham arrived, they were visibly armed, and Smith stated, "We're here to do business." According to Tuttle, Pearce then spoke with these three men outside. Brittingham also testified that Pearce and Smith spoke to each other at a distance from Brittingham, so that he did not hear what was said. At some point, Pearce told the three men that Tuttle and Crawford were going to show them where to find the people who stole Pearce's money. Pearce, still holding his gun, then told Tuttle and Crawford to get in his car. Loucks refused to allow Pearce to take his step-son, Shook, as well. Loucks offered to drive Tuttle and Crawford, who had arrived in Havner's car, to their homes and to get Pearce the money in the morning. Pearce refused, but told Loucks he was not going to hurt the boys--only take them down the road, punch them in the mouth, and make them walk home. Pearce instructed Loucks to wait by the phone to hear from the boys.

Pearce, Smith, Butterfield, Brittingham, Tuttle and Crawford left in Pearce's car, a two-door trans am with T-tops. Pearce drove, and Smith sat in the front passenger seat. In the back, Tuttle sat on Crawford's lap in the middle, while Butterfield and Brittingham sat on either side of the boys. After driving a short time, Pearce turned in the wrong direction for traveling to Barcomb's location. He drove a short distance more and performed a U-turn. According to Butterfield's testimony, sometime during this drive Smith told Pearce that his 9 mm pistol jammed and the two exchanged guns, with Smith receiving Pearce's functional .40 caliber pistol. Brittingham also testified that Pearce and Smith exchanged guns during this trip.

Pearce stopped the car along the side of the road and told Tuttle to get out of the car. Smith first exited from the passenger's side and stood between the door and the car while Tuttle crawled over Brittingham from the middle of the backseat and out the passenger's side. Pearce told Smith to "Pop him in the f---ing jaw," to which Smith replied, "F--- that." Smith then

turned around and shot Tuttle once in the back of the head. When Smith got back in the car, Pearce asked, "Is he dead?" and Smith replied, "Yeah, he's dead. I shot him in the head with a f---ing .40." Pearce then drove approximately two hundred yards further, stopped the car, and Smith again exited the vehicle. Pearce ordered Crawford out. Crawford complied while pleading, "Don't. Please don't." Smith shot Crawford once in the head, Crawford fell, and Smith shot him a second time in the chest.

After leaving the scene, Smith threatened to kill Butterfield and Brittingham if they snitched. Pearce drove to a restaurant where he and Smith ate. Pearce and Smith then left Butterfield and Brittingham at a grocery store, telling them not to leave. They returned approximately forty minutes to an hour later. They drove to a bridge, where Smith wrapped the .40 caliber pistol in newspaper and threw it in the water. Shortly thereafter they split ways, and Smith attempted to leave town by bus but was unable to do so because of an approaching hurricane.

Remarkably, Tuttle survived the gunshot to his head. At trial, he testified that he remembered getting out of the car, then everything went black, and his next memory was waking up on the side of the road. He felt the hole in his head but did not remember being shot or who shot him. He eventually flagged down assistance. Crawford, however, died at the scene.

The entire course of these events occurred during the evening of September 13, and into the morning of September 14, 1999. That morning, Butterfield and Brittingham were located and interviewed by police. Smith was arrested on the same day, and Pearce was located and arrested a couple of weeks later. The murder weapon, Pearce's .40 caliber pistol, was recovered from the location in Tampa Bay where Butterfield testified Smith had thrown it, and the bullets found in Tuttle and Crawford were matched to the same pistol.

Smith and Pearce were charged as codefendants and tried separately. Butterfield and Brittingham served as State witnesses. At trial, the defense's theory was that although Smith was present in the car, Pearce was the shooter, possibly through the T-top opening in the car, and that Butterfield and Brittingham's testimonies were designed to cover for Pearce by naming Smith as the shooter. On May 3, 2001, a jury convicted Smith of the attempted first-degree murder of Tuttle and the first-degree murder of Crawford.

## II. PROCEDURAL HISTORY

Petitioner was convicted of first-degree murder and attempted first-degree murder (Respondent's Ex. 2). He was sentenced to death on the murder conviction and life in prison on the attempted murder conviction (*Id.*). The Florida Supreme Court affirmed the convictions and life sentence but remanded the case to the trial court for a new penalty phase hearing (*Id.*). Petitioner was resentenced to life in prison on the murder conviction (Respondent's Ex. 7). Florida's Second District Court of Appeal affirmed the sentence (Respondent's Ex. 13); *Smith v. State*, 29 So. 3d 304 (Fla. 2d DCA 2010) [table].

Petitioner filed an amended post-conviction motion pursuant to Rule 3.850, Fla.R.Crim.P. (Respondent's Ex. 16), memorandum in support (Respondent's Ex. 16A), and a supplement to the motion (Respondent's Ex. 16B). The state post-conviction court issued an order denying some grounds, struck others, and directed the State to respond to the remaining claims (Respondent's Ex. 17). Following Petitioner's amendment to Ground 3, Subclaim 10 (Respondent's Ex. 18), the State's response (Respondent's Ex. 19), and Petitioner's reply (Respondent's Ex. 20), the State court denied the remaining grounds (Respondent's Ex. 21). The state appellate court affirmed the denial of Petitioner's amended Rule 3.850 motion (Respondent's Ex. 29); *Smith v. State*, 115 So. 3d 1011 (Fla. 2d DCA 2013) [table].

Petitioner filed his petition for a writ of habeas corpus and memorandum in support in this Court (Docs. 1, 2).

## III. GOVERNING LEGAL PRINCIPLES

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003). The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

### A. Standard of Review Under the AEDPA

Pursuant to the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the

'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id.*

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A determination of a factual issue made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

**B. Standard for Ineffective Assistance of Counsel**

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient

performance prejudiced the defense.[2]  *Id*. at 687-88.  A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. at 689-90.  "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Id*. at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir. 1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted).   Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."   *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

## C. Exhaustion of State Remedies and Procedural Default

Before a district court can grant habeas relief to a state prisoner under § 2254, the petitioner must exhaust all state court remedies that are available for challenging his conviction,

---

[2]In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the United States Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

either on direct appeal or in a state post-conviction motion. *See* § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A state prisoner "'must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (quoting *O'Sullivan*, 526 U.S. at 845.)

To exhaust a claim, a petitioner must make the state court aware of both the legal and factual bases for his claim. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass on and correct alleged violations of its' prisoners federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)). A federal habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State. . .if he has the right under the law of the State to raise, by any available procedure, the question presented." *Pruitt*, 348 F.3d at 1358. The prohibition against raising an unexhausted claim in federal court extends to both the broad legal theory of relief and the specific factual contention that supports relief. *Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004).

The requirement of exhausting state remedies as a prerequisite to federal review is satisfied if the petitioner "fairly presents" his claim in each appropriate state court and alerts that court to the federal nature of the claim. 28 U.S.C. § 2254(b)(1); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). A petitioner may raise a federal claim in state court "by citing in conjunction with

the claim the federal source of law on which he relies or a case deciding such claim on federal grounds, or simply by labeling the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F. 3d 695, 703 (11th Cir. 1999). *See also Murray v. Carrier*, 477 U.S. 478 (1986). To show prejudice, a petitioner must demonstrate not only that the errors at his trial created the possibility of prejudice but that they worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimensions. *United States v. Frady*, 456 U.S. 152 (1982). The petitioner must show at least a reasonable probability of a different outcome. *Crawford v. Head*, 311 F.3d 1288, 1327-28 (11th Cir. 2002).

Alternatively, a petitioner may obtain federal habeas review of a procedurally defaulted claim if review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Carrier,* 477 U.S. at 495-96. A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). To meet this standard, a petitioner must show a reasonable likelihood of acquittal absent the constitutional error. *Schlup*, 513 U.S. at 327.

## IV. ANALYSIS

**Ground One**

Petitioner contends that the state trial court was without jurisdiction to try and convict him because the Indictment was invalid, since it was drafted, signed, and filed by Bruce Bartlett, who was neither the State Attorney nor a "qualified" assistant state attorney. He asserts that under Florida law only the State Attorney or a qualified assistant state attorney may draft, sign, or file indictments to initiate criminal charges. Petitioner's claim fails for several reasons.

First, his claim presents a state law issue for which federal habeas corpus relief does not lie. Whether the Indictment was procedurally sufficient under Florida law is a state law matter. Federal relief is available to correct only constitutional injury. *Wainwright v. Goode*, 464 U.S. 78 (1983). Federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution, not to correct errors of state law. *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Even when a petition which actually involves state law issues is "couched in terms of equal protection and due process," this limitation on federal habeas corpus review is of equal force. *See Willeford v. Estelle*, 538 F.2d 1194, 1196-98 (5th Cir. 1976). A violation of Florida's jurisdictional mandates does not raise a federal constitutional issue for which federal habeas relief may be granted. *See Cook v. Morrill*, 783 F.2d 593, 595-96 (5th Cir. 1986); *Caudill v. Scott*, 857 F.2d 344, 345-46 (6th Cir. 1988).

Second, the Court agrees with Respondent that to the extent Petitioner attempts to allege a federal constitutional violation, the claim is procedurally defaulted because he failed to fairly present such a claim to the state courts. When Petitioner raised this claim on appeal from his resentencing, he framed his argument only in terms of state law (Respondent's Ex. 10 - Initial Brief, pp. 9-16). For a habeas petitioner to fairly present a federal claim to state courts:

It is not sufficient merely that the federal habeas petitioner has been through the state courts . . . nor is it sufficient that all the facts necessary to support the claim were before the state courts or that a somewhat similar state-law claim was made. Rather, in order to ensure that state courts have the first opportunity to hear all claims, federal courts "have required a state prisoner to present the state courts with the same claim he urges upon the federal courts." While we do not require a verbatim restatement of the claims brought in state court, we do require that a petitioner presented his claims to the state court "such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation."

*McNair v. Campbell*, 416 F.3d 1291, 1302-03 (11th Cir. 2005).

Because Petitioner framed his claim solely as error under state law, rather than federal constitutional law, he did not fairly present a federal constitutional violation to the state courts. Consequently, he did not satisfy the exhaustion requirement of § 2254.

Any attempt by Petitioner now to exhaust state remedies regarding this claim would be futile under Florida law, since Petitioner may not take a second appeal of his conviction. Therefore, any federal constitutional claim is procedurally defaulted.  And although the procedural default may be excused through a showing of cause for the default and prejudice arising therefrom, *see Coleman*, 501 U.S. at 750, or a demonstration that failure to consider the claim will result in a "fundamental miscarriage of justice," *see Murray*, 477 U.S. at 495-96, Petitioner has failed to show that he is entitled to federal review under either exception to the procedural bar.

Third and finally, Respondent correctly argues that this claim is procedurally defaulted because Petitioner waived it by failing to challenge the Indictment prior to entering his plea to the charges and proceeding to trial.  *See Jenkins v. State*, 6 So. 3d 71, 72 (Fla. 3d DCA 2008) ("by proceeding to trial under the information, Jenkins waived any objection to it.") (citing Fla. R. Crim. P. 3.140(g) (specifying that any alleged defect as to a signature or oath in an

information must be asserted prior to a determination of the case on the merits)). *See also* Florida Rule of Criminal Procedure 3.190(c) (providing that a defendant "shall move to dismiss the indictment or information either before or at arraignment," otherwise the claim is deemed waived).

Since Petitioner did not move to dismiss the Indictment prior to entering his plea and proceeding to trial, he waived the claim. In its Answer Brief on appeal, the State raised the argument that the claim was untimely and waived (Respondent's Ex. 11). Under these circumstances, the appellate court's silent affirmance is presumed to rest on the independent and adequate state procedural ground. *See Ylst v. Nunnemaker*, 501 U.S. 797 (1991). Petitioner has not shown both cause excusing the default and actual prejudice resulting from the bar. Furthermore, he has not shown that he is entitled to the fundamental miscarriage of justice exception. Accordingly, because Ground One is barred from federal review, it does not warrant federal habeas relief.

**Ground Two**

In Ground Two, Petitioner asserts eleven claims of ineffective assistance of trial counsel.

### Subclaim a

Petitioner complains that trial counsel failed to effectively cross examine State witnesses Butterfield and Brittingham. He asserts that there was impeachment material, their prior statements and depositions, available for counsel to challenge their trial testimony on several matters, including the following: 1) the gun swap between Pearce and Petitioner; 2) Petitioner's statement that his gun jams; 3) the private conversation between Pearce and Petitioner at "We Shelter America;" 4) Brittingham's testimony that he felt safe telling Petitioner to get out of his car; 5) Brittingham's testimony that he saw Petitioner discard the gun into the water; 6)

Brittingham's testimony regarding when he first saw Butterfield with a gun; 7) Brittingham's ability to observe the shootings; 8) the reason Brittingham brought a shotgun; 9) Brittingham's "deal" to cooperate with law enforcement; 9) Butterfield's testimony that Pearce told Petitioner to break Tuttle's jaw; and 10) Butterfield's testimony that after Pearce and Petitioner dropped him and Brittingham off at the Winn Dixie parking lot, Butterfield walked to another store to telephone his girlfriend. Petitioner further complains that counsel should have "brought to light at trial" that in one of Brittingham's prior statements he said that the guns were not put into the trunk of the car, and in his subsequent deposition he testified that they were put into the trunk.

This ineffective assistance of counsel claim was raised in state court in Ground Two, Subclaim 2 of Petitioner's Amended Rule 3.850 motion (Respondent's Ex. 16, pp. 5-12). In denying the claim, the state post-conviction court stated:

> Defendant next claims his attorney was ineffective in failing to effectively impeach witnesses Theodore Butterfield and Heath Brittingham with their prior inconsistent statements.
>
> **A. Heath Brittingham**:
>
> 1. This witness testified that Defendant switched guns with co-defendant Faunce Pearce before Defendant shot the victims, Stephen Tuttle and Robert Crawford. Defendant alleges that if counsel had impeached Brittingham with his prior inconsistent statements on this issue, it would have changed the outcome of his trial. The defense's theory at trial was that although Defendant was present in the car, Pearce was the shooter and Brittingham and Butterfield were covering for Pearce by naming Defendant as the shooter. Brittingham testified on direct examination that Defendant switched guns with Pearce before he shot the victims. Defendant claims Brittingham never mentioned this exchange in his prior statements. He alleges that in his deposition Brittingham denied knowledge of how Defendant got Pearce's gun. Defendant claims that impeachment of the witness would have changed the outcome of the trial as there was no physical or forensic evidence he shot the victims.
>
> It does not appear from the record that Brittingham made a specific prior

statement about the actual exchange of guns. However, the record indicates that Brittingham made prior statements that he saw Defendant with Pearce's gun the night of the shootings and heard Defendant say that he shot one of the victims with the .40 caliber gun (Pearce's gun). During his deposition, Brittingham testified that Defendant admitted shooting the first victim with Pearce's .40 caliber gun. The witness stated, "Joey [Defendant] said, "Yes, I'm fucking sure. I shot him in the head with a fucking .40." See December 21, 2000 Deposition, p. 58. At his January 13, 2000 deposition, this witness testified he saw Defendant with Pearce's gun the night Defendant shot the victim. Brittingham stated, "Yeah, I seen him with Faunce's .40 caliber a few times." The prosecutor asked, "When?" The witness, responded, "I seen him with it that night when he shot them kids." See January 13, 2000 Deposition, p. 27-28. This court finds that Brittingham 's trial testimony was, therefore, generally consistent with his prior deposition statements putting Pearce's gun in Defendant's possession. Accordingly, counsel cannot be ineffective for choosing not to impeach when there is no available impeachment.

Further, during cross-examination, counsel got Brittingham to admit that he was "not sure exactly what they traded" and did not actually see the trade. See Trial Transcript, p. 491-492, lines 21-25 and 1-6. In addition, Defendant cannot show any prejudice even if counsel did not impeach the witness with every prior inconsistent statement that may exist on this issue. The state sought Defendant's conviction on a premeditated murder theory as well as on a felony murder theory. The state argued that the victims were held at gunpoint by Pearce who called for reinforcements. Defendant, Brittingham and Butterfield all arrived with weapons to assist Pearce. The court, over defense counsel's objection gave a felony murder instruction to the jury. Trial Transcript, p. 701; 770-774. Accordingly, even if the jury did not believe that Defendant personally shot the victims, if the jury found Defendant to be an accomplice or participant in the underlying felony of kidnapping, he can still be found guilty under a felony murder theory. Moreover, Defendant does not claim Brittingham made any prior contradictory statements to police as to who shot the victims. He points out only minor inconsistencies between his trial testimony and his prior statements regarding details of the shootings.

As will be discussed later in this order, Brittingham and Butterfield offered consistent testimony that Defendant personally shot the victims. Finally, any alleged inconsistencies Defendant claims exist between their accounts does not equate to potential impeachment based on prior inconsistent statements. Moreover, during closing arguments, defense counsel pointed out the inconsistencies that existed between the testimony of these two witnesses. He also emphasized that they were friends of each other and of Pearce but not friends of the Defendant. Further, he reminded the jury that Brittingham and Butterfield were not charged with these crimes. Trial transcript, p. 724-757. Therefore, this Court finds counsel sufficiently cross-examined and impeached Brittingham on

this issue with the available impeachment. The Court further finds that Defendant has not shown how any alleged failure by counsel in this regard affected the outcome of his trial.    Therefore, this claim lacks merit and is denied.

2.  Defendant also claims counsel failed to impeach Brittingham's testimony that he observed Defendant having a private conversation with Pearce before Pearce ordered the victims into his car. He claims Brittingham never mentioned this conversation in his prior statements.   He argues that this testimony, which he claims was offered only by Brittingham, caused the jury to believe Defendant conspired with Pearce to kill the victims.

First, the Court notes that Defendant is incorrect that no witness other than Brittingham testified to this conversation.   After victim Stephen Tuttle testified that Defendant, Brittingham and Butterfield arrived at the scene in response to Pearce's call for assistance, the prosecutor asked him: "When they show up, was Mr. Pearce basically giving the other three commands?   Tuttle answered, "That's how I would -yeah, I would say so...They were all-they were all talking together in a little crowd by the side of the passenger side of the car, in front of We Shelter America [one of the crime scenes].   I don't know what they were saying."   Trial transcript, p. 401, lines 22-25.
Next, the record demonstrates that in a deposition, counsel asked Brittingham whether Pearce and Defendant were having any conversations the night of the shootings. Brittingham stated that "they were leaned up talking to each other pretty much the whole night."   See December 21, 2000 Deposition, p. 19.    The witness's deposition testimony was, therefore, consistent with his trial testimony.   Consequently, counsel is not ineffective for failing to impeach when there is no available impeachment. This claim is refuted by the record and is also without merit.

Again, the court notes that the state sought Defendant's conviction on a premeditated murder theory and on a felony murder theory.   Even if the jury did not believe that Defendant planned to shoot and shot the victims, if the jury found Defendant to be an accomplice or participant in the underlying felony of kidnapping, he is still equally guilty of first degree murder and attempted first degree murder.   Therefore, Defendant cannot show how he was prejudiced, even if counsel failed to impeach this witness with every existing inconsistent prior statement.

3.  Defendant alleges next that counsel was ineffective in failing to impeach Brittingham on his testimony that he saw Butterfield with a gun on the way to We Shelter America.   Brittingham actually testified that he initially did not see Butterfield with a gun and only saw it after they got in the car on the drive to We Shelter America.   See Trial transcript, p. 461; 464-465. Defendant claims this contradicted his deposition testimony that he never saw Butterfield with a gun and a prior statement to the prosecutor that he first saw Butterfield's gun at We

Shelter America. Defendant alleges that this impeachment would have shown how Brittingham changed his story to "cover for Butterfield and match his story". While it would be ideal for a defense attorney to impeach or cross examine using every available minor inconsistency between prior statements and trial testimony, Defendant fails to explain what difference this impeachment would have made at trial in light of the corroborating consistent testimony from the other witnesses. Brittingham and Butterfield testified consistently that Defendant was the only one who got out of the car when the victims were shot. See trial testimony of Brittingham and Butterfield, attached. The surviving victim, Tuttle, testified that he was shot after Defendant got out of the car and ordered him out of the car. Trial transcript, p. 404, lines 20-25, p.405, lines 1-18. Defendant's participation is therefore corroborated by the other witnesses and his own statement (related by Butterfield) that Tuttle was the thirteenth or fourteenth person Defendant shot. Trial transcript, p. 433, lines 21-23. Accordingly, the Court finds that failure to impeach on this alleged inconsistency would not have made any difference in the outcome of the trial in light of the other consistent corroborating testimony that Defendant shot the victims. There is also no real dispute in the testimony that Defendant was an accomplice in the kidnappings and was present in the car when the victims were shot. Moreover, there is no testimony from any of the witnesses that Pearce got out of the car and shot the victims. Tuttle testified that he was ordered out of the car, Defendant got out of the car and then he was apparently shot. Trial transcript, p. 404-405. Butterfield testified that Defendant got out of the car to let Tuttle out. Pearce then told Defendant to break Tuttle's jaw. Butterfield stated that he heard a gunshot but did not actually see the shooting as it was nighttime. As noted above, he testified that Defendant said that Tuttle was the thirteenth or fourteenth person he had shot. Trial transcript, p. 430-433. Brittingham testified that Pearce and Defendant ordered Tuttle out of the car, Pearce ordered Defendant to "pop him in the jaw", but Defendant instead shot Tuttle in the head. Trial transcript, p. 472-477. He testified further that Defendant then admitted, "I shot him in the head with an F'ing .40" Transcript, p. 475, lines 5-6. Brittingham testified that Defendant told the other victim (Crawford) to get out of the car and that he saw Defendant shoot him twice. Trial transcript, p. 475-477. Moreover, as previously discussed, defense counsel pointed out during closing argument all the inconsistencies that existed between the witnesses' testimony and between their trial testimony and prior statements. Trial transcript, p. 725-757. Accordingly, this claim is refuted in the record and lacks merit. This claim is denied.

4. Next, Defendant claims counsel failed to impeach Brittingham's trial testimony that he felt safe ordering Defendant out of the car after he saw Defendant throw away the murder weapon. He alleges that this testimony conflicts with his deposition testimony that Defendant forced him with a 9mm pistol to take him to a train station after the shootings. He also claims that this trial testimony conflicts with a prior statement that Brittingham "slept from the time he was picked up from the Winn Dixie parking lot until he returned to

Damian Smith's house."   However, Brittingham did not testify on direct examination that he ordered the Defendant out of his car or even that he felt safe ordering the Defendant out of his car when he drove him to the bus station. Instead, he testified that he drove Defendant to the bus station and to another destination after he could not buy a bus ticket.   Trial transcript, p. 480-481. Accordingly, the court finds that this claim is refuted in the record and lacks merit.   This claim is therefore denied.

However, the court notes that on cross examination, defense counsel impeached this witness on this issue with a deposition where he stated he told Defendant, of whom he was allegedly afraid, to "get the fuck out of my car". Trial transcript, p.499-501.

5. Defendant argues that counsel was ineffective for failing to adequately impeach Brittingham on his ability to observe the shootings.   Brittingham testified at trial that he saw Defendant shoot Tuttle in the back of the head. The prosecutor asked, "And you actually saw that?"   The witness responded, "As much as you can see.   It was in the middle of the night, and it was dark, and there
wasn't no street lights."   He also testified that, " ... I looked at him, and I seen the flashing from the barrel and I seen the kid start to fall. And I just looked back forward...."   Trial transcript, p. 472-474.   The prosecutor asked the witness to state exactly what he observed. Brittingham testified, "I turned, and I looked at Joey just as he said, 'F that'. And I was wondering what he was going to do. And I looked at him, and I seen the kid start to fall. And I just looked back forward...."
He testified that he saw the gun in Defendant's hand after he shot Tuttle. Transcript, p. 474, lines 24-25.   He also testified that Pearce asked Defendant if Tuttle was dead and Defendant responded, "Yeah, he's dead. I shot him in the head with an F'ing .40."   Trial transcript, p. 475, lines 4-6.   Brittingham further testified that they drove on and Defendant told Robert Crawford to get out of the car.   He stated, "Joey fired a shot, and I seen the kid fall. And then Joey stood over top of him, and he fired again."   He continued to describe the shooting in great detail.   Trial transcript, p. 475-476.   Defendant alleges that in a prior statement, Brittingham claimed he could not see either victim and that counsel failed to impeach him with this inconsistency. However, the record shows that defense counsel got Brittingham to admit that it was dark when both victims got out of the car and that there were no street lights.   He also admitted that he was not able to see either victim after they got out of the car.   Trial transcript, p. 493 and 494, 15-19. Brittingham also admitted on cross-examination that he was a friend of Butterfield and Pearce, but was not friendly with Defendant. Trial transcript, p. 494-496.

Ideally, counsel can point out every inconsistency that may exist between a witness's trial testimony and all prior statements or depositions.   However, the court does not find counsel deficient for failing to point out every potential

inconsistency between the witnesses' prior statements and trial testimony. Moreover, on cross-examination, defense counsel got Brittingham to admit that it was dark where the victims were shot and was not able to see either victim, contrary to his testimony on direct examination. Accordingly, the Court finds that counsel was not ineffective in his cross examination of Brittingham for not attempting to impeach the witness on every potential inconsistency about his ability to see the shootings. The court finds that this claim lacks merit and is refuted in the record. This claim is, therefore, denied.

6. Defendant claims that counsel was ineffective for failing to impeach Brittingham on his testimony that he took his shotgun to the first crime scene (We Shelter America) because he was afraid it would get stolen if he left it in his car. He claims that he previously told police that he brought the gun because Butterfield told him to. On direct examination, Brittingham testified that he brought his shotgun to We Shelter America and put it in Pearce's car. Trial transcript, p. 465-466. On cross-examination, counsel asked him whether Butterfield asked him to come with him to assist Pearce. Brittingham denied that Butterfield specifically asked him to come. Trial transcript, p. 485-486. First, the court finds that contrary to Defendant's contention, counsel attempted to impeach Brittingham's testimony. However, Brittingham denied that Butterfield had specifically asked him to come with the others to We Shelter America. Therefore, this Court finds that this claim is refuted in the record and should be denied on that basis alone. Moreover, as previously discussed, counsel can ideally impeach a witness on every small inconsistency that may exist between a witness's trial testimony and all prior statements or depositions in an attempt to attack the credibility of the witness. However, the Court finds that Defendant has specifically failed to show how he was prejudiced in this regard. Again, there is an abundance of other corroborating testimony in this record that Defendant was, at the very least, an accomplice in the kidnapping of the victims and abundant consistent testimony that he personally shot the victims. In addition, counsel discussed Brittingham's inconsistent statements during closing arguments. Defendant cannot, therefore, establish any prejudice in regard to counsel's alleged failure to impeach this witness using all prior inconsistent statements. This claim is denied.

**B. Theodore Butterfield**

1. Defendant alleges that if counsel had impeached Butterfield with his prior inconsistent statements, it would have changed the outcome of the trial. Butterfield testified on direct examination that Defendant switched guns with Pearce because Defendant's 9mm gun jammed. Defendant claims Butterfield did not mention this in a September 15, 1999 statement to police and further did not mention it until his March 26, 2001 deposition. He claims counsel was ineffective in failing to impeach the witness with this omission. However, the record refutes this claim. During cross examination, counsel asked Defendant,

"When you gave...  your sworn statement to Mr. Van Allen on September 15, 1999... you didn't say anything about any switching of guns; isn't that correct?" Defendant answered, "No, sir." He added, "I did say they switched guns." Trial transcript, p. 457-458.  Counsel thus made the jury aware that Butterfield apparently gave a prior inconsistent statement about Defendant switching guns before shooting the victims, even though he denied making the inconsistent statement.  Also, during closing argument, counsel told the jury: "He doesn't say anything about this, the switch of this - this alleged switch of guns- until later when he's giving a deposition. But earlier he makes absolutely no explanation of any switch of guns between Mr. Pearce and Mr. Smith."  Trial transcript, p. 739-740.  This court also finds that counsel's impeachment on this issue was sufficient and that further impeachment would not have made any difference at trial in light of the other corroborating testimony about Defendant's participation in these offenses.  This claim is refuted by the record and lacks merit. This claim is denied.

2. Defendant also claims counsel was ineffective in failing to impeach Butterfield on his trial testimony that Defendant asked Pearce to trade guns prior to shooting the victims, because Defendant's gun jammed. He appears to claim that in a prior statement Butterfield claimed Defendant asked Pearce to trade guns after the shootings, when he threw away the murder weapon.  As previously discussed, counsel can ideally impeach a witness on every small inconsistency that may exist between a witness's trial testimony and all prior statements or depositions in an attempt to attack the credibility of the witness.  The court finds that Defendant has specifically failed to show how he was prejudiced in regard to this alleged failure to impeach.  Again, there is an abundance of corroborating testimony in the record that Defendant was, at the very least, Pearce's armed accomplice in the kidnapping of the victims.  There is also ample evidence in the record that he personally shot the victims.  He cannot, therefore, establish any prejudice in regard to counsel's alleged failure to impeach Butterfield using all alleged prior inconsistent statements.

3. Defendant claims that in prior statements Butterfield revealed that he made a deal with the police to avoid criminal charges.  He claims counsel was ineffective for not objecting when the prosecutor told the jury that Butterfield had no motive to lie at trial. On direct examination, Butterfield admitted that he initially lied to investigators and gave several different versions of the events to investigators.  He then decided to cooperate with the police.  Trial transcript, p. 438-439.  On cross examination, defense counsel got Butterfield to admit that he initially lied to the police but then cooperated fully with police and therefore had not been charged with any crimes regarding this case. Trial transcript, p. 444, lines 17-21; 445-446.  Counsel also pointed out during cross-examination that Butterfield had several motives to lie about the facts of this case: Butterfield described the drug money that Pearce was attempting to recover from the victims as "our money"; he had conducted previous drug deals with Pearce; he knew

Pearce from working together in the fireworks business; he owed Pearce money and he was friends with Brittingham and Pearce but was only an acquaintance of the Defendant. Trial transcript, p. 443-444; 459-460. Finally, during closings, counsel argued that the jury should discount Butterfield's testimony as he was not charged with the shootings or any other crimes "regardless of any activities that he was involved in on September 13." Trial transcript, p. 738-739. Accordingly, the Court finds that counsel sufficiently cross examined Butterfield and argued to the jury that Butterfield was not a trustworthy witness. Accordingly, this claim is refuted by the record and lacks merit. This claim is denied.

    4. Butterfield testified that Pearce told Defendant to break Tuttle's jaw. Defendant claims he never disclosed this in a prior statement and counsel failed to impeach him on this testimony. As previously discussed, counsel can ideally impeach a witness on every inconsistency that may exist between a witness's trial testimony and all prior statements or depositions in an attempt to attack the credibility of the witness. The court finds that Defendant has specifically failed to show how he was prejudiced in regard to this alleged failure to impeach. Again, there is an abundance of corroborating testimony in the record that Defendant was an accomplice in the kidnapping of the victims, was present in the car, and that he personally shot the victims. He cannot, therefore, establish any prejudice in regard to counsel's alleged failure to impeach Butterfield using all purported omissions from prior statements or inconsistent statements. This claim is denied.

    5. Butterfield testified on direct examination that after the shootings Defendant and Pearce dropped him and Brittingham in a grocery store parking lot and ordered them to wait. He testified that he walked across the street to use the phone and waited for thirty or forty minutes for Defendant and Pearce to return. Trial transcript, p.436. Defendant claims that in a deposition Butterfield stated he was afraid he was being watched and thought he might be shot if he used the telephone. He claims counsel was ineffective in failing to cross examine on this inconsistency. However, on cross examination, counsel got Butterfield to admit that he did not run away, did not call the police and even walked across the street to use the phone and get a drink, even though he stated he was threatened by Defendant. Trial transcript, p. 448-449. The Court finds counsel successfully impeached the witness by pointing out that his actions belied his testimony that he was afraid of Defendant. The Court also finds that counsel was not ineffective in this regard. As discussed above, counsel can ideally impeach a witness on every inconsistency that may exist between a witness's trial testimony and all prior statements or depositions in an attempt to attack the credibility of the witness. Defendant has specifically failed to show how counsel was deficient and that he was prejudiced in regard to any failure to impeach on this point. Defendant has not, therefore, established any prejudice in regard to counsel's purported failure to impeach Butterfield using all alleged omissions from prior statements or inconsistent statements. This claim is denied.

> 6. Defendant alleges counsel was ineffective for failing to point out to the jury the inconsistencies between testimony and statements given by Butterfield and Brittingham. As previously discussed, at closing counsel vigorously emphasized the inconsistencies in the witness testimony. Trial transcript, p. 725-757. This claim is refuted in the record and is, therefore, denied.

(Respondent's Ex. 17, pp. 5-13).

The state post-conviction court found that defense counsel sufficiently cross-examined and impeached Butterfield and Brittingham regarding inconsistencies between their testimony and prior statements and pointed out in closing the inconsistencies between their trial testimony and between their trial testimony and prior statements. The court further found that Petitioner failed to demonstrate that additional impeachment using all prior inconsistent statements would have produced a different result at trial. The court concluded that Petitioner failed to demonstrate either deficient performance or prejudice.

### 1. The gun swap

The first inconsistency identified by Petitioner is Butterfield and Brittingham's testimony that Pearce and Petitioner switched guns before the shootings. He asserts that defense counsel should have impeached them with the fact that neither of them mentioned the gun swap in their statements to police or the State Attorney, Brittingham never mentioned it in his deposition, and Butterfield never mentioned it until his March 26, 2001 deposition.

The transcript of Brittingham's statement to the State Attorney reveals that although he never mentioned that Pearce and Petitioner switched guns, he never was asked a question that would have elicited that answer (Doc. 56, Exhibit 1).[3] Moreover, he did state that Petitioner had the .40 caliber, rather than the 9mm he previously had, when he shot the victims (*Id.*,

---

[3] Butterfield and Brittingham's statements to law enforcement are not included in the record before this Court.

transcript pp. 12, 19). He further stated that Petitioner said to Pearce, "I shot him in the head with a fucking .40." (*Id*., transcript p. 20). And the transcript of his first deposition shows that he stated that he saw Petitioner with Pearce's gun the night of the shootings (Doc. 56, Exhibit 2, transcript pp. 27-28). Additionally, during his second deposition Brittingham again testified that Petitioner said he shot Tuttle with a .40 caliber (Doc. 56, Exhibit 3, transcript p. 15). Accordingly, the state post-conviction court's finding that Brittingham's trial testimony with respect to the gun swap was "generally consistent with his prior deposition statement putting Pearce's gun in [Petitioner's] possession" was not unreasonable. Therefore, defense counsel did not render deficient performance in failing to question Brittingham about omitting the fact of the gun swap in his prior statement(s) and depositions. Moreover, as the state post-conviction court correctly found, defense counsel sufficiently impeached Brittingham with regard to the gun swap by getting him to admit that he never actually saw Pearce and Petitioner swap the guns and was "not sure exactly what they traded" (Respondent's Ex. 34, transcript pp. 491-92).

The transcript of Butterfield's statement to the State Attorney reveals that even though he did not mention the gun swap, he was not asked how Petitioner came into possession of Pearce's gun (Doc. 56, Exhibit 4). And the transcript of his deposition shows that he mentioned the gun swap (Doc. 56, Exhibit 5, transcript p. 16). Therefore, Butterfield's prior statement and deposition testimony is not inconsistent with his trial testimony regarding the gun swap. Moreover, defense counsel made the jury aware that Butterfield had previously omitted any mention of a gun swap in his statement to the State Attorney (Respondent's Ex. 34, transcript pp. 457-58; Ex. 36, transcript pp. 739-40).

The state post-conviction court's conclusion that Petitioner failed to show either deficient performance or prejudice with regard to defense counsel's impeachment of Butterfield and

Brittingham concerning the gun swap was not an unreasonable application of *Strickland*.

### 2. Petitioner's comment that his gun jams

During trial, Butterfield testified that before Pearce and Petitioner swapped guns, and before the shootings, Petitioner said to Pearce that his "pistol jams." (Respondent's Ex. 34, transcript p. 430). Petitioner contends that counsel was ineffective in failing to impeach Butterfield with his prior sworn statement during which he indicated that after the shooting, Petitioner had made a comment that the .40 shot better because it did not stick (*See* Doc. 56, Exhibit 4, transcript p. 33).

Petitioner has failed to demonstrate deficient performance. First, the content of the sworn statement regarding this issue is consistent with Butterfield's trial testimony that Petitioner had made a comment to Pearce that the .40 caliber did not "stick" or "jam" like Petitioner's 9mm handgun. Moreover, the sworn statement and trial testimony are not inconsistent because Petitioner may have made comments regarding the gun sticking or jamming both before and after the shootings. Second, had defense counsel used the sworn statement to attempt to impeach Butterfield, it would have highlighted that Petitioner had made statements that his 9mm handgun would "jam," and that is why he swapped guns with Pearce. Accordingly, Petitioner is entitled to no relief with regard to his claim that defense counsel failed to impeach Butterfield with respect to when Petitioner commented that his handgun "jams."

### 3. Pearce and Petitioner's "private" conversation

During trial, Brittingham testified that after he, Butterfield, and Smith were dropped off at "We Shelter America," they entered Loucks' home with Pearce, and Pearce started a conversation with Petitioner, which Brittingham could not hear (Respondent's Ex. 34, transcript p. 465-66). Petitioner contends that counsel should have impeached Brittingham with his prior

statements and depositions that showed he never previously stated that Pearce and Petitioner had a "private conversation" while inside Loucks' home. He argues that he was prejudiced by the testimony because the State used it to argue that "there was a discussion unheard by anyone, that occurred between Lawrence Joey Smith and Faunce Pearce before they got in that car" and imply that Pearce and Petitioner plotted to kill the victims (Respondent's Ex. 36, transcript p. 785).

In evaluating this claim, the Court must keep in mind that "[j]udicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Moreover, "[a] hindsight review of any cross-examination will unquestionably reveal an opportunity to ask one more question or highlight one more point; however, in the midst of a trial with an adverse witness on the stand, a lawyer must always make split-second decisions as to how to best shape his questioning in order to extract the most desirable responses." *Yarbrough v. Johnson*, 490 F. Supp. 2d 694, 738-739 (E.D. Va. 2007).

Here, even if Brittingham never previously stated that he saw Pearce talking to Petitioner inside Loucks' office, at best it would have been a minor omission or inconsistency. The statement was made only once at trial, and Brittingham testified that he did not hear what they were saying. Moreover, although during closing argument the prosecutor may have referenced this conversation between Pearce and Petitioner (*see* Respondent's Ex. 36, transcript p. 785), the prosecutor did not state that Pearce and Petitioner hatched a plan to kill the victims at that time. And, as the state post-conviction court correctly noted, witnesses testified that there were other occasions that night when Pearce and Petitioner were talking to each other.

This Court therefore finds no deficiency in counsel not using Brittingham's prior statements and depositions to attempt to impeach Brittingham regarding his testimony that Petitioner started a conversation with Pearce inside Loucks' office.

**4. Butterfield's testimony that he felt safe telling Petitioner to get out of his car because he saw Petitioner throw the gun into the water**

Brittingham testified at trial that after the shootings, after Petitioner had thrown the gun in the water, and after bringing Petitioner to the bus station, he drove Petitioner to a neighborhood and told him to get out of his car (Respondent's Ex. 34, transcript pp. 499-51). When defense counsel questioned him about directing Petitioner to get out of the car when he was allegedly afraid that Petitioner might kill him (*see id*., transcript pp. 500-01), Butterfield explained "I seen [Petitioner] throw the pistol that he used to kill the two boys, out the window and in the water, I didn't feel that he could shoot me with that gun anymore."  (*Id*., transcript p. 501).  Petitioner contends that counsel should have impeached Brittingham with his inconsistent deposition testimony in which he stated that he was forced to take Petitioner to the bus station because Petitioner had the 9mm handgun and told him that he would shoot him if he did not take him to the station (Doc. 56, Exhibit 3, transcript p. 22).

It is apparent from the trial transcript that the point of defense counsel's cross-examination of Brittingham with respect to this matter was to show that Brittingham was not afraid of Petitioner because Petitioner was not the shooter and never threatened anyone (*See* Respondent's Ex. 34, transcript pp. 499-501).  During closing, counsel argued that Brittingham was not afraid of Petitioner because he and Butterfield waited in the Winn Dixie parking lot for an hour after Pearce and Petitioner dropped them off rather than leaving or calling the police, got back into Pearce's car when Pearce and Petitioner returned, and later told Petitioner to "get the

fuck out of my car." (Respondent's Ex. 36, transcript pp. 747-49). Therefore, pointing out that Brittingham had testified that Petitioner had the 9mm handgun and had threatened to shoot him if he did not drive him to the bus station would have weakened counsel's argument that Brittingham was never afraid of Petitioner, and likely weakened Petitioner's defense that he was not the shooter. Accordingly, counsel was not ineffective in failing to attempt to impeach Brittingham with this statement.[4]

### 5. When Brittingham first saw Butterfield's gun

During trial, when Brittingham was asked whether he saw Butterfield with a weapon when they left to go meet Pearce at "We Shelter America," he answered, "No, not when we left. I didn't see it until after we were in the car." (Respondent's Ex. 34, transcript p. 465). Petitioner contends that counsel should have impeached Brittingham with his sworn statement during which he stated that he first saw Butterfield's gun when they were at "We Shelter America," and his deposition during which he testified that he first saw Butterfield's gun after they left "We Shelter America." He argues that this would have shown that Brittingham constantly changed his story to cover for Butterfield.

During his sworn statement, Brittingham stated that he became aware that there were other weapons when they pulled up to "We Shelter America." (Doc. 56, transcript pp. 10-11). Arguably, that statement is not inconsistent with Brittingham's trial testimony because he did not

---

4 Petitioner further alleges that Brittingham's trial testimony that he witnessed Petitioner throw the .40 caliber gun into the water is contradicted by a handwritten statement that Brittingham gave to police the day after the shootings in which he allegedly said he was sleeping between the time he and Butterfield were picked back up from the Winn Dixie parking lot to when he arrived at Damian Smith's house that morning. However, because the handwritten statement is not in the record, the Court cannot determine whether Brittingham's trial testimony was inconsistent with his handwritten statement. Moreover, Petitioner cannot show prejudice because even if Brittingham was asleep in Pearce's car at the time the gun was thrown into the water, Butterfield also testified that Petitioner threw the gun into the water (Respondent's Ex. 34, transcript pp. 436-37). Additionally, in both his sworn statement and deposition, Brittingham testified that Petitioner threw the gun into the water (Doc. 56, Ex. 1, transcript pp. 26-27;

specify where they were when he saw the guns "in the car." Brittingham's testimony during his deposition that he did not see Butterfield with a weapon until after they got into Pearce's car to leave "We Shelter America" (*see* Doc. 56, Exhibit 3, transcript pp. 46-47) may be inconsistent with his trial testimony. Nevertheless, the moment Brittingham first saw that Butterfield had a gun was essentially immaterial to the case, especially considering the evidence established that Butterfield had a gun and was in Pearce's car when the victims were kidnaped and shot. Counsel's failure to highlight minor inconsistencies on largely immaterial matters was not ineffective assistance of counsel. *See, e.g., Campbell v. United States*, 364 F.3d 727, 735 (6th Cir.2004); *Allen v. Woodford*, 395 F.3d 979, 999 (9th Cir. 2005) (there is no ineffective assistance where defense counsel decides not to impeach a witness over inconsequential matters).

### 6. Brittingham's ability to observe the shootings

Petitioner contends that counsel should have impeached Brittingham's trial testimony regarding what he saw during the shootings with his prior inconsistent statements. During trial, he testified that he saw Petitioner shoot both victims. However, he admitted that it was dark, there were no lights, and he could not actually see the victims when they were shot (Respondent's Ex. 34, transcript pp. 474, 476, 494). When he gave his statement to the State Attorney, he said that he could not see Tuttle when he was shot because "of the metal on the side of the car" (Doc. 56, Ex. 1, transcript p. 19), and he could not see Crawford when he was shot because he was looking at Butterfield at the time (*Id*., transcript p. 22). Brittingham's trial testimony and sworn statement therefore were consistent to the extent Brittingham stated that he was not able to see the victims clearly when they were shot. Only Brittingham's explanation of

Ex. 3, transcript p. 20).

why he could not see the victims varied. And counsel impeached Brittingham with that inconsistency by making the jury aware that Brittingham had made a prior statement that he did not see Crawford when he was shot because he was looking the other direction at Butterfield (Respondent's Ex. 36, transcript pp. 503-04).

During his deposition, when Brittingham was asked whether he saw Petitioner shoot Tuttle, he answered, "Yes, sir, I saw it. That's something I will never forget." (Doc. 56, Ex. 3, transcript pp. 13-14). When he was asked whether he saw Petitioner shoot Crawford, he answered, "Yes, sir." (*Id.*, transcript p. 14). And when he was asked how many times Crawford was shot, he answered, "He shot at him once, and then he stood over top of him while he was on the ground, and he shot him again." (*Id.*). On examination by defense counsel, Brittingham testified that he could see Petitioner when he shot Tuttle and saw him stick the gun approximately six inches to a foot from Tuttle's head as he shot him (*Id.*, transcript pp. 55-57). When asked if he saw Petitioner shoot Crawford, he answered, "Yes, sir, I seen it. I seen the flash from the barrel. I seen the kid. He had his hands up." (*Id.*, transcript p. 60).

This prior testimony appears at least slightly inconsistent to Brittingham's trial testimony. Nonetheless, defense counsel elicited from Brittingham testimony that during the shootings it was too dark to see well, and he could not even see the victims when they were shot. Since Brittingham admitted upon cross-examination that it was very difficult to see the shootings, there was no need to impeach him with respect to his ability to see the shootings. There would not have been much value in attempting to impeach Brittingham with prior statements that may have refreshed his memory about facts that were more damaging to the defense. Accordingly, defense counsel's failure to attempt to impeach Brittingham with these prior statements and testimony was neither unreasonable nor prejudicial.

### 7. Brittingham's reason for bringing a shotgun

During cross-examination at trial, Brittingham testified that he brought a shotgun to "We Shelter America" because he "didn't want to leave it in [his] car. [He] was afraid it would get stolen." (Respondent's Ex. 34, transcript pp. 484-85). Petitioner contends that counsel should have impeached Brittingham with a videotaped interview he gave to police the day after the shootings during which he allegedly stated that he brought the shotgun with him because Butterfield asked him to bring it, and he did not know "what kind of a situation he was walking into." Petitioner argues that this would have been another example of Brittingham "covering" for Butterfield or attempting to match Butterfield's story.

Because the videotaped interview is not in the record, it cannot be determined whether Brittingham's statements during the interview are inconsistent with his trial testimony. Moreover, counsel adequately cross-examined Brittingham concerning his testimony that he brought the shotgun because he was worried that it would be stolen by getting Brittingham to admit that he brought shotgun shells as well and brought both the shotgun and the shells when they subsequently left in Pearce's car (Respondent's Ex. 34, transcript pp. 485-86). This implied that Brittingham brought the shotgun to use it rather than to prevent it from being stolen. Furthermore, when Brittingham testified that he put the shells on the floor of Pearce's car, counsel impeached Brittingham with his deposition testimony where he testified that he "took [his] shotgun, but [] didn't take [his] box of shells," and his prior sworn statement where he stated that he "left [his] shotgun shells in the glove compartment." (*Id*., transcript pp. 486-89). And during closing argument, counsel reminded the jury of the inconsistencies between Brittingham's trial testimony and prior statements regarding the shotgun (Respondent's Ex. 36, transcript p. 745). Accordingly, defense counsel adequately impeached Brittingham regarding

his reason for bringing his shotgun.

### 8. Butterfield's deal with police to cooperate to avoid criminal charges

Petitioner contends that in Butterfield's statement to the State Attorney and deposition, he testified that he made a deal with the police to cooperate if no criminal charges were pressed against him. He argues that counsel was ineffective in failing to alert the jury to the deal Butterfield made with the police, and he was prejudiced because the State was therefore able to argue that Butterfield had no incentive to lie.

This claim is belied by the record. First, as discussed in more detail below in addressing Ground 3 of the petition, Petitioner has failed to demonstrate that there was a "deal" between Butterfield and police that no charges would be brought against Butterfield if he cooperated. Butterfield specifically testified during his deposition that there was no deal between him and either law enforcement or the State Attorney (Doc. 56, Ex. 5, transcript p. 30). At most, Butterfield indicated that the police told him that it would be to his benefit to cooperate and tell the truth (*Id*.; Doc. 56, Ex. 4, transcript p. 39). Second, defense counsel adequately impeached Butterfield by getting him to admit that he initially lied to the police but then cooperated fully and therefore had not been charged with any crimes (Respondent's Ex. 34, transcript, pp. 444-46). And during closing argument, defense counsel reminded the jury that despite Butterfield's participation, he was not charged with any offense (Respondent's Ex. 36, transcript pp. 738-39). Accordingly, counsel adequately apprised the jury that Butterfield had an incentive to lie and cooperate with police.

### 9. Pearce told Petitioner to break Tuttle's jaw

During trial, Butterfield testified that after he, Pearce, Petitioner, Brittingham, Tuttle, and Crawford drove approximately two to three miles away from "We Shelter America," Pearce

stopped the car and ordered Tuttle to get out of the car (Respondent's Ex. 34, transcript p. 430). After Petitioner got out of the car to let Tuttle out, Butterfield heard Pearce tell Petitioner "to break [Tuttle's] jaw" for getting his money ripped off (*Id*.). Petitioner contends that counsel was ineffective in failing to impeach Butterfield with his sworn statement to the State Attorney in which he stated that he did not hear Pearce tell Petitioner to break Tuttle's jaw. He argues that this was "yet another example of how. . .Butterfield and Brittingham[] continuously change their stories in order to match one another." (Doc. 1, docket p. 16).

The transcript of Butterfield's deposition reveals that when Butterfield was asked, "[Pearce] didn't say anything about breaking his jaw or anything like that?", he answered "I didn't hear nothing like that. No, sir." (Doc. 56, transcript p. 22). Nonetheless, Butterfield stated that Pearce told Petitioner to "punch [Tuttle] in his mouth" just before Petitioner shot Tuttle (*Id*., transcript pp. 21-22). Therefore, had counsel attempted to use the prior sworn statement to impeach Butterfield concerning this matter, it likely would have done more harm to his defense than good because the jury would have heard that the day after the shootings Butterfield gave a statement that was consistent with his trial testimony that Petitioner let Tuttle out of the car, and Pearce told Petitioner to punch Tuttle in the mouth just before Petitioner shot Tuttle. The minor inconsistency between the two statements - - "punch him in the mouth" and "break his jaw"- - is not significant when weighed against the generally consistent testimony Butterfield presented in his prior statement and at trial. Accordingly, counsel was not deficient in failing to impeach Butterfield regarding this matter.

**10. Butterfield's actions after the shootings**

During trial, Butterfield testified that after the shootings he and Brittingham were eventually dropped off by Pearce and Petitioner at a Winn Dixie (Respondent's Ex. 34, transcript

33

p. 436).   He further testified that he and Butterfield went inside the Winn Dixie "to see what time it was" and "walked to a Circle K to use that phone over there."   (*Id.*). On cross-examination, he added that they went to use the phone at the Circle K to call his girlfriend to "let her know [he] would be home in a little while."

Petitioner contends that counsel should have impeached Butterfield regarding this testimony with his deposition where he testified that he and Brittingham stayed at the Winn Dixie "[b]ecause [they] didn't know if [Pearce and Petitioner] could see [them], if [Pearce and Petitioner] were watching [them]. If [they] tried to call the police, if [Pearce and Petitioner] would shoot [them].   [They] didn't know what to expect."   (Doc. 56, Ex. 5, transcript p. 26). He argues that this testimony was inconsistent with Butterfield's trial testimony that he left the Winn Dixie to walk to the Circle K to use the telephone to call his girlfriend.

Counsel was not ineffective in failing to impeach Butterfield with this deposition testimony.   First, the deposition testimony was essentially consistent with the trial testimony. During his deposition, Butterfield testified that he and Brittingham stayed at the Winn Dixie because they were afraid that Pearce and Petitioner could be watching them and might shoot them if they called the police (*Id.*).   And at trial, Butterfield also testified that he and Brittingham "stayed right there and waited for [Pearce and Petitioner]" because earlier they had been threatened by Pearce and Petitioner (Respondent's Ex. 34, transcript p. 449). The only variation between the testimony is that at trial Butterfield added the detail that they had walked across the street to attempt to use the telephone to call Butterfield's girlfriend.   That testimony is not wholly inconsistent with Butterfield's deposition testimony that they stayed at Winn Dixie because they were unsure if they were being watched and were afraid they might be shot if they called the police.

Second, even if the trial and deposition testimony could be considered inconsistent, attempting to impeach Butterfield with his deposition testimony likely would have done him more harm than good. His trial testimony that he and Brittingham walked to Circle K to use the telephone tended to show that he and Brittingham may not have been as afraid of Pearce and Petitioner as they claimed to be. This testimony therefore supported the defense's theory that Butterfield and Brittingham were not afraid of Petitioner because he never shot or threatened anyone that night. As the state post-conviction court stated, "counsel successfully impeached [Butterfield] by pointing out that his actions belied his testimony that he was afraid of [Petitioner]." Attempting to impeach Butterfield with prior testimony that he and Brittingham felt compelled to remain at the Winn Dixie out of fear that they were being watched and could be shot would have weakened Petitioner's defense. Accordingly, counsel was not ineffective in failing to impeach Butterfield with this deposition testimony.

**11. Testimony regarding whether guns were placed in the trunk of Pearce's car after the shootings**

During trial, Brittingham testified that his shotgun remained with him in Pearce's car until it was placed into the trunk of Pearce's car after the shootings (Respondent's Ex. 34, transcript pp. 490-91). Petitioner contends that counsel "should have brought to light" that Brittingham had given a statement to the State Attorney in which he said that the trunk of the car was never opened after the shootings, but subsequently testified during his deposition that the guns were placed in the trunk after the shootings. He argues that the inconsistency between Brittingham's initial statement to the State Attorney and his deposition and trial testimony would have shown the jury that Brittingham changed his testimony to "match" Butterfield's statement to the State Attorney that all the guns were placed in the trunk after the shootings.

Whether the guns were placed into the trunk sometime after the shootings was an inconsequential matter in the trial. Moreover, as the state post-conviction court correctly stated, defense counsel vigorously emphasized several inconsistencies in the witness testimony. (Respondent's Ex. 36, transcript pp. 725-57). Additionally, defense counsel impeached both Butterfield and Brittingham's trial testimony, on numerous issues, with their prior inconsistent statements, and argued that, considering these inconsistencies, they were not credible witnesses. It is apparent that Petitioner's defense was not prejudicially impacted merely because defense counsel could have elicited this additional impeachment information on cross-examination.

Petitioner has not demonstrated that the state court's denial of this claim was contrary to, or involved an unreasonable application of, federal law, nor has he established that the decision was based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, Ground Two, Subclaim a does not warrant federal habeas relief.

**Subclaim b**

Petitioner contends that defense counsel was ineffective in failing to elicit crucial testimony from Tuttle. According to Petitioner, Tuttle could have testified that 1) Petitioner never told him or the other victim, Crawford, to get into the car, 2) no one threatened him to get into the car, and 3) he never stated that he did not want to get into the car. Petitioner argues that this testimony 1) would have shown that Petitioner was unaware that Pearce was kidnaping Tuttle and Crawford, and did nothing to assist Pearce in kidnaping them, and 2) would have negated the jury's findings for felony murder predicated on the kidnaping.

In state court, Petitioner raised this claim in Ground 3, Subclaim 3 of his Amended Rule 3.850 motion (Respondent's Ex. 16, p. 13). In denying the claim, the state post-conviction court stated:

Defendant claims counsel was ineffective when he failed to use at trial testimony given at a deposition by surviving victim Stephen Tuttle. However, testimony given in a deposition is hearsay, which is an out of court statement that is inadmissible at trial. Counsel cannot be ineffective in failing to attempt to introduce statements at trial that are inadmissible hearsay. This claim lacks legal merit and is therefore denied.

(Respondent's Ex. 17, p. 13).

To the extent Petitioner asserts that defense counsel was ineffective in failing to introduce Tuttle's deposition testimony during trial, the state post-conviction court determined that counsel was not ineffective in failing to do so because the deposition testimony was inadmissible hearsay. In Florida, "discovery depositions may not be used as substantive evidence in a criminal trial." *State v. James*, 402 So. 2d 1169, 1171 (Fla. 1981). Accordingly, the state post-conviction court's determination that counsel was not deficient in failing to introduce Tuttle's deposition testimony was not objectively unreasonable.

To the extent Petitioner contends defense counsel was ineffective at trial in failing to elicit testimony from Tuttle that Petitioner never told him to get into the car, no one threatened him to get into the car, and he never stated that he did not want to get into the car, the claim likewise does not warrant relief. In Florida, to convict a defendant of kidnaping, the State must prove (1) the defendant forcibly, secretly, or by threat, (2) confined, abducted or imprisoned, (3) the victim against his or her will. *See* Fla. Std. Jury Inst. 9.1. "A defendant is guilty as a principal if he 'aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed.'" *Wade v. State*, 156 So. 3d 1004, 1017 (Fla. 2014) (quoting § 777.011, Fla. Stat.).

There was ample evidence that Petitioner was a principal to the kidnaping that preceded the murders. Loucks testified that when Petitioner, Butterfield, and Brittingham arrived at his

office where Pearce was holding him, Shook, Havner, Tuttle and Crawford, they were armed with guns (Respondent's Ex. 28 - trial testimony of Loucks - transcript p. 310). And when they got out of the car, they stated that "it was time to do some business," and they were going to take [Tuttle] and [Crawford] in the car (*Id.*). Loucks further testified that after Petitioner and the others arrived, Pearce ordered Tuttle and Crawford into the car while waiving a gun (*Id.*, transcript p. 311).

Shook testified that after Petitioner, Butterfield, and Brittingham arrived with handguns and shotguns, Petitioner stated that he "was going to take care of business." He further testified that Tuttle and Crawford had guns pointed at them before they were taken in the car, and it was apparent that they were not free to leave but were forced to go with Petitioner and the others (*Id.*, transcript pp. 329-33).

Tuttle testified that 1) Pearce put a gun to Tuttle's head and forced him to commit a sexual act on Pearce, 2) Petitioner, Butterfield, and Brittingham subsequently arrived with guns, 3) Pearce stated "everybody pile in the car[,]" and 4) he felt he had no choice but to get into the car (*Id.*, transcript pp. 399-402).

Even if defense counsel had elicited testimony from Tuttle that Petitioner never gave him an order to get into the car, and no one actually "threatened" him to get him to enter the car, the outcome of the trial would not have changed. Tuttle, Loucks, and Shook's testimony was sufficient to prove that Petitioner aided Pearce in kidnaping Tuttle and Crawford. Petitioner, Pearce, Butterfield, and Brittingham were armed with guns, Petitioner stated he was there "to take care of business," Pearce had pointed a gun at Tuttle and forced him to commit a sex act on him, and Tuttle believed he had no choice but to comply with Pearce's order to get into the car.

Petitioner has not demonstrated that the state courts' denial of this claim was contrary to,

38

or involved an unreasonable application of, federal law, nor has he established that the decision was based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, Grond Two, Subclaim b does not warrant federal habeas relief.

**Subclaim c**

Petitioner contends that trial counsel was ineffective in failing to impeach Loucks and Shook's testimony that when Petitioner, Butterfield, and Brittingham arrived at Loucks' office (We Shelter America), Petitioner said they came "to take care of business." Petitioner argues that counsel should have impeached their testimony with the multiple statements they previously made to law enforcement and the State Attorney's Office in which they never mentioned that Petitioner said that they came "to take care of business." Petitioner further asserts that counsel should have impeached Shook's trial testimony with Shook's testimony during his deposition that Petitioner had stated that he was going to a motel room to "take care of business." Petitioner argues that Shook's deposition testimony shows that the "take care of business" comment referred to retrieving Pearce's stolen money from the thieves that were staying in a motel, rather than the kidnaping and murder. He further argues that Shook's deposition testimony proves Shook fabricated his testimony that Petitioner said he was there to "take care of business" because Shook did not know the thieves were staying at a motel "until facts of the case were slowly brought to light. . . ." Finally, Petitioner contends that counsel should have impeached Shook's testimony at trial that Petitioner, Pearce, Butterfield, and Brittingham took Crawford and Tuttle out of Loucks' office with Shook's deposition testimony that only Pearce took them out.

In state court, Petitioner raised this claim in Ground 3, Subclaim 4 of his Amended Rule 3.850 motion (Respondent's Ex. 16, pp. 13-14). In denying the claim, the state post conviction court stated:

Here, Defendant alleges that counsel was ineffective for failing to impeach witnesses Ken Shook and Bryan [sic] Loucks.

**A. Bryon Loucks**: Defendant claims that Bryon Loucks testified that Pearce called Defendant, Brittingham and Butterfield to help him recover drug money. They arrived at We Shelter America and stated that it was "time to take care of business".[FN1] Defendant claims Loucks never previously mentioned Defendant's statement. Defendant claims counsel failed to impeach Loucks on this issue. He claims he was prejudiced as a result, but does not explain how he was prejudiced. When alleging ineffective assistance of counsel, the Defendant must prove first that counsel's performance was deficient, and second, that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). As this court has previously noted, the legal standard for such an evaluation is "reasonably effective counsel, not perfect or error-free counsel." See Tuffeteller v. Dugger, 734 So. 2d 1009, 1022 n.14 (Fla. 1999). Even if Defendant alleged that this statement prejudiced him as it demonstrated a premeditated plan to murder the victims, this claim still lacks merit. The state sought Defendant's conviction on a premeditated murder theory and a felony murder theory. Even if the jury did not believe that Defendant had a premeditated plan to shoot the victims, if the jury found Defendant to be an accomplice or participant in the underlying felony of kidnapping, he is still guilty of murder and attempted murder. Loucks testified that Defendant stated he was there "to do business and...take Steve and Rob in the car". *Trial transcript, p. 310.* Clearly, this testimony supports the state's theory that Defendant was at the very least an accomplice in the kidnapping of the victims. Further, as previously discussed, counsel is not necessarily ineffective for failing to cross examine and impeach a witness on every potential inconsistency between their trial testimony and prior statements. This claim lacks merit and is legally insufficient. This claim is denied.

**B. Ken Shook**: Shook testified that Pearce called Smith, Brittingham and Butterfield to assist him to recover drug money. They all arrived with weapons. He stated, "Well, they all come in, and they are all standing around talking about they were going to go take care of business. That's what Joey says." *Trial Transcript, p. 329-330.* Defendant appears to allege that counsel should have impeached the witness with his alleged prior inconsistent statements or omissions, but again fails to explain what difference this would have made at trial. Moreover, the record indicates that defense counsel got Shook to admit that Pearce made all the threats and "was in charge of the whole scenario." *Trial transcript, p. 337.* Further, counsel objected and moved to strike Shook's statement that Defendant announced he was there to "take care of business." However, the court overruled the defense objection and allowed the testimony. *Trial transcript, p. 330.* The court does not find [sic] that counsel was not deficient in this regard and effectively cross examined Shook. This claim is denied.

Defendant also alleges counsel failed to impeach Shook when he testified that Defendant, Pearce, Brittingham and Butterfield took the victims individually outside Loucks' office. He claims that in his deposition, Shook stated that only Pearce took the victims outside. He claims counsel failed to impeach Shook with his inconsistent statement. Again, Defendant fails to explain how he was prejudiced and what difference impeachment on this alleged inconsistency would have made at his trial. As previously discussed, ideally counsel can impeach or cross-examine a witness on every conceivable inconsistent statement or omission. Defendant has failed to show how Defendant suffered any prejudice for a failure to impeach on this testimony. Therefore, this claim lacks merit and is denied.

[FN1] Mr. Loucks' actual testimony was that when Defendant, Brittingham and Butterfield arrived, they stated, "it was time to do business, and they was [sic] going to take [the victims] in the car." *Trial transcript, p. 310.*

(Respondent's Ex. 17, pp. 13-14).

The state post-conviction court's determination that Petitioner failed to establish prejudice resulting from his counsel's failure to impeach Loucks and Shook with prior statements was not an unreasonable application of clearly established Supreme Court law. In order to obtain relief under a Sixth Amendment claim of ineffective assistance of counsel, a defendant must not only establish deficient performance by counsel, but the defendant must also demonstrate prejudice under the two-pronged *Strickland* test. In his Rule 3.850 motion, Petitioner failed to allege any prejudice other than to simply say Loucks and Shook's testimony that Petitioner said they were there "to take care of business," and Shook's testimony that Petitioner and the others took the victims out of Loucks' office, was "the most damaging testimony given against me by these two witnesses. . . ." (Respondent's Ex. 16, pp. 13-14). Petitioner failed to explain how the testimony was damaging to his case (*Id*.). Accordingly, his allegations were insufficient to show prejudice and warrant relief under *Strickland*. *See Hill v. Lockhart*, 474 U.S. 52 (1985) (petitioner must allege specific facts establishing both deficient representation and prejudice); *Tejada v. Dugger,* 941 F.2d 1551, 1559 (11th Cir. 1991) (vague

and conclusory allegations are insufficient to support relief on a claim of ineffective assistance of counsel).

To the extent Petitioner now attempts to show prejudice by alleging additional factual support (*see* Doc. 1, docket pp. 12-23) that was not presented to the state post-conviction court, he is procedurally barred from doing so. "Habeas petitioners generally cannot raise claims in federal court if those claims were not first exhausted in state court." *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (citing 28 U.S.C. § 2254(b)(1); *Kelley v. Sec'y for Dept. of Corr.*, 377 F.3d 1317, 1343 (11th Cir. 2004)). "[T]he prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the *specific assertions of fact* that might support relief." *Kelley*, 377 F.3d at 1344 (emphasis added). Because Petitioner has failed to show cause for his default and has failed to make a colorable showing of actual innocence, this claim is procedurally barred from review.

Even if Petitioner's new claim of prejudice were not procedurally barred, Petitioner would not be entitled to relief because he fails to demonstrate deficient performance. Although Petitioner alleges that Loucks and Shook's prior statements do not mention that Petitioner stated that they were there "to take care of business," the statements are not included in the record before the Court. Without the statements, the Court cannot determine whether Loucks and Shook omitted Petitioner's "take care of business" comment. Moreover, even if that comment was omitted, it is not clear under Florida law whether counsel would have been allowed to impeach Loucks and Shook with their prior statements. *See Varas v. State*, 815 So. 2d 637 (Fla. 3d DCA 2001) ("It is well-settled that a witness may be impeached by a prior inconsistent statement, including an omission in a previous out-of-court statement about which the witness testifies at trial, if it is of a material, significant fact rather than mere details and would naturally

have been mentioned."). Without the statements, the Court cannot determine whether Petitioner's alleged comment that they were there to "take care of business" would naturally have been mentioned in those statements.

Petitioner has failed to demonstrate that the state post-conviction court unreasonably applied federal law or made an unreasonable determination of the facts. Accordingly, Ground Two, Subclaim c does not warrant federal habeas relief.

**Subclaim d**

Petitioner contends that trial counsel was ineffective in failing to adequately investigate his case and present available evidence. Specifically, Petitioner asserts that counsel should have: 1) called Deborah Smith, Deborah Kaeberlein, Melissa Ellerbee, and Kelley Ross who each would have testified that Butterfield stated that he intended to testify falsely against Petitioner in order to "save himself;" 2) called Holly Self to testify that Petitioner did not force Brittingham to drive him to the bus station, and that after the murders Brittingham was not scared of and anxious to get away from Petitioner because when he dropped Petitioner off at a residence, Brittingham remained there approximately 30 minutes; 3) obtained the results of the State's gunshot residue test, or had an independent test conducted on the clothes Petitioner wore on the night of the crime, which would have proven that Petitioner did not fire a gun on the night of the crime; 4) presented an autopsy report and photographs of the gunshot wounds on Crawford which, coupled with Brittingham's description of how Crawford was shot, would have established that Crawford was shot by someone much shorter than Petitioner; and 5) photographs of the interior of Pearce's car that would have rebutted a) Butterfield and Brittingham's testimony that they saw Petitioner and Pearce swap guns before the shootings, and b) Brittingham's testimony regarding how he saw Petitioner shoot the victims.

In state court this claim was raised in Ground 3, Subclaim 6 of Petitioner's Amended Rule 3.850 motion (Respondent's Ex. 16, pp. 16-19). In denying the claim, the state post-conviction court stated:

Defendant alleges counsel was ineffective for failing to conduct adequate pre-trial investigation or present evidence at trial.

1. First, he claims counsel should have called as witnesses Deborah Smith, Melissa Ellerbee, Deborah Kaeberlein and Kelley Ross. He claims these witnesses would have testified that they heard Butterfield state that he was going to testify falsely about Defendant to save himself. However, these alleged out of court statements would have been deemed by the court inadmissible hearsay. Objections by the state to this testimony would have been sustained. Counsel cannot be ineffective for failing to call witnesses whose proposed testimony is inadmissible hearsay. Defendant has failed to show that counsel was deficient by not calling these witnesses. This claim is denied.

2. Defendant claims Holly Self would have testified that Defendant did not force Brittingham to drive him to the bus station after the shootings and that this witness was not afraid of Defendant. He claims this testimony would have attacked Brittingham's credibility. This claim has no merit. Even if counsel had called this witness to impugn Brittingham's testimony, her testimony would not have been sufficient to overcome the evidence in the record establishing Defendant's involvement in these offenses. As discussed above, Defendant's participation was corroborated by his own statements as well as by the trial testimony of other witnesses. Further, additional testimony regarding Defendant's flight after the shootings would only confirm Defendant's involvement in the murder and attempted murder. Therefore, Defendant has failed to show that counsel was deficient by not calling this witness. This claim is denied.

3. Defendant alleges that counsel was ineffective for failing to "investigate or seek the results to any of the forensic tests performed by police" or seek independent testing of the evidence. Defendant specifically refers to a gunshot residue test, testing on his clothing and testing for fingerprints on bullet casings. Defendant does not, however, allege how the results of the tests would have assisted him or how independent tests would have supported his defense theory or affected the outcome of the trial. During opening statements, defense counsel advised the jury that there was no forensic or physical evidence including gunshot residue testing and finger prints, linking Defendant to the shootings. *Trial transcript, p. 291.* No physical or forensic evidence connecting Defendant to the crimes was introduced at trial. Counsel advised the jury during closing argument of this lack of physical evidence and that the gunshot residue test

performed on Defendant was negative. *Transcript, p. 726; 750-751*. Therefore, the record is clear that counsel was aware of the results of all forensic tests performed by law enforcement. Moreover, it was also clear at trial that the state had no physical evidence linking Defendant to the crime. Therefore, Defendant's claim that counsel was somehow deficient in failing to request this evidence and in failing to have independent tests performed is refuted by the record and is also nonsensical. There is no valid reason or basis for defense counsel to seek independent testing of physical evidence that fails to link a defendant to a crime. This claim lacks merit and is refuted by the record. This claim is therefore denied.

4. Defendant claims that the medical examiner's report and autopsy photographs "strongly suggest" that Crawford was shot by someone much shorter than himself. Defendant claims that he is nearly the same height as Crawford but that Pearce and Butterfield are much shorter men. He claims counsel was deficient for failing to argue that this evidence shows he did not shoot Crawford. First, this allegation is conclusory and appears to be based on nothing more than Defendant's own speculation, and as such, it cannot form the basis for postconviction relief. See Knight v. State, 923 So. 2d 387 (Fla. 2005) (holding that speculative and conclusory allegations are insufficient to warrant an evidentiary hearing). Further, defense counsel thoroughly cross examined the medical examiner, Dr. Marie Hansen, revealing that she was unable to ascertain whether the victim was standing, sitting or crouching when he was shot. *Trial transcript, p. 608-609*. The court finds that counsel was not deficient in this regard. This claim is denied.

5. Defendant claims counsel was deficient by failing to use photographs of the interior of Pearce's car to establish that Butterfield and Brittingham could not have seen him trade guns with Pearce and that Brittingham could not have seen the shootings. The Court finds this allegation is conclusory and appears to be based on nothing more than Defendant's own speculation, and as such, it cannot form the basis for postconviction relief. See Knight v. State, 923 So. 2d 387 (Fla. 2005) (holding that speculative and conclusory allegations are insufficient to warrant an evidentiary hearing). This claim lacks merit and is denied.

(Respondent's Ex. 17, pp. 15-17).

**1. Failure to call witnesses**

Initially, Petitioner has failed to present any evidence to support his allegation that these witnesses would have testified as he suggests. *See United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be

presented in the form of actual testimony by the witness or an affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim.") (footnotes omitted). He therefore cannot obtain habeas relief on this claim. *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("Johnson offers only speculation that the missing witnesses would have been helpful. This kind of speculation is 'insufficient to carry the burden of a habeas corpus petitioner.'") (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985)).

Even if he had presented evidence in support, the claim still would fail. With regard to Smith, Ellerbee, Kaeberlein, and Ross, the state post-conviction court has answered the question of what would have happened had defense counsel attempted to present their alleged testimony that Butterfield told them that he was going to testify falsely against Petitioner - - the testimony would have been excluded as inadmissible hearsay.

With regard to Self, Petitioner's girlfriend who allegedly would have testified that Brittingham was not afraid of Petitioner and was not forced to drive her and Petitioner to the bus station, her proposed testimony would have been of marginal value. Butterfield testified, in pertinent part, that after they went to Pearce's house, he had to drop Petitioner and Self off at the bus station (Respondent's Ex. 34, transcript p. 480). When they discovered no tickets were being sold because of a pending hurricane, Petitioner dropped them off in another neighborhood (*Id.*, transcript p. 481). On cross-examination he testified that he was fearful that Petitioner might kill him (*Id.*, transcript p. 500).

Self's alleged testimony that Brittingham did not appear to be afraid of Petitioner when he took them to the bus station would have had little value considering the significant evidence demonstrating Petitioner's involvement in the kidnaping and shooting of the victims. Moreover,

46

calling Self to testify would have presented the State with the opportunity to question her regarding why she and Petitioner were suddenly leaving on a bus shortly after the shootings. As the state post-conviction court stated, this could have provided additional testimony showing Petitioner was fleeing after the shootings and further implicated him in the shootings. Therefore, Petitioner has failed to show that counsel was deficient in failing to call these witnesses and that he was prejudiced because they did not testify.

**2. Failure to obtain gunshot residue report and test Petitioner's clothes for residue**

Petitioner contends that counsel was ineffective in failing to investigate any of the physical evidence in the State's possession. Specifically, Petitioner states that counsel should have: 1) obtained the results of the gunshot residue test that was taken from Petitioner and secured independent testing of the gunshot residue "kit"; and 2) obtained the State's test results for, or obtained independent testing of, the clothes Petitioner was wearing at the time of the shootings. He argues that the test results would have been negative and therefore established that he did not fire a gun on the night of the shootings.

This claim fails because Petitioner does not demonstrate prejudice. He neither alleges nor shows that gunshot residue testing of him or his clothes yielded exculpatory evidence. Rather, he merely speculates that both tests were or would have been negative. *See Aldrich v. Wainwright*, 777 F.2d 630, 637 (11th Cir.1985) (speculation insufficient to carry burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation); *Bible v. Ryan*, 571 F.3d 860, 871 (9th Cir.2009) (speculation about test results is insufficient to show *Strickland* prejudice).

This claim likewise fails because Petitioner does not demonstrate deficient performance. Petitioner fails to account for the potential that independent testing could have proved damaging

to the defense.   The fear of the unknown may, itself, be reasonable.   *Chandler v. United States*, 218 F.3d 1305, 1324 (11th Cir. 2000). At least one reasonably competent attorney under the circumstances could forego the proposed testing because such evidence might produce incriminating evidence against Petitioner.   *See e.g., Jones v. Galdis*, 2005 WL 1705470 (M.D.Fla. July 20, 2005) (unpublished) (reasonably competent attorney could forego request for experts on gunshot residue to avoid risk testing might serve to inculpate defendant, especially where eyewitness testimony implicated him as shooter).   Moreover, considering the State failed to present the results of any testing (gunshot residue, fingerprints, etc.), defense counsel was able to effectively argue to the jury that reasonable doubt existed because no forensic or physical evidence showed that Petitioner was the shooter (Respondent's Ex. 36, transcript pp. 726, 750-51).   It is therefore objectively reasonable to conclude that Petitioner has failed to show that counsel was deficient in failing to obtain test results and independent testing of the evidence.

### 3. Failure to argue that evidence showed Crawford was shot by someone shorter

Petitioner contends that counsel was ineffective in failing to use the medical examiner's autopsy report and photographs of Crawford to argue that the upward angle of the gunshot wound suggests that the shooter was "significantly shorter" than Crawford.   He argues that since he is only one inch shorter than Crawford, and Pearce and Brittingham stand 5'6" and 5'3" respectively, this shows that it is more likely one of them shot Crawford.

As discussed in more detail below in Ground 2, Subclaim i, Petitioner's contention is wholly speculative and unsupported by the record.   The medical examiner testified that both Crawford and the shooter could have been in "many potential positions that would be consistent" with the trajectory of the bullet wounds (Respondent's Ex. 35, transcript pp. 608-09). Moreover, both Butterfield and Brittingham testified that it was dark and very difficult to see the

actual shootings (Respondent's Ex. 34, transcript pp. 432, 453, 476).   Accordingly, Petitioner has failed to show that counsel was deficient in failing to use this evidence to argue that the shooter was "significantly shorter" than Crawford.

**4. Failure to use photographs of interior of Pearce's car to argue witnesses could not see alleged gun swap, and Brittingham could not see the shootings**

Petitioner contends that counsel was ineffective in failing to use photographs of the interior of Pearce's car to "rebut the testimony of Butterfield and Brittingham concerning the alleged gun swap."   He argues that the photographs would have shown that Butterfield and Brittingham could not have seen Pearce and Petitioner swap guns from where they were sitting.

This claim warrants no relief because Petitioner demonstrates neither deficient performance nor prejudice.   First, he shows no prejudice because there are no photographs in the record before this Court, and therefore his assertion that Butterfield and Brittingham could not have seen the swapping of guns is unsupported and speculative.   It is more than plausible that if Butterfield was sitting in the seat behind the driver, and Brittingham was sitting in the seat behind the front passenger, they still could see a gun passed between Pearce, who was driving, and Petitioner, who was in the front passenger seat.   Second, he shows no deficient performance or prejudice because while it is possible that the photographs in question might have aided the defense presentation of whether Petitioner swapped guns with Pearce before the shooting, they would have been merely cumulative of other evidence that came out at trial.   Brittingham testified that he could not see the gun swap because he "was in the back [of the car], crammed into the far corner."   (Respondent's Ex. 34, transcript p. 492).   And defense counsel argued during closing that the gun swap testimony lacked credibility because in Butterfield's initial statements he made "absolutely no explanation of any switch of guns between Mr. Pearce and

Mr. Smith" (Respondent's Ex. 36, transcript p. 740), and that Butterfield and Brittingham had multiple opportunities to contrive a story that explained how Petitioner came into possession of Pearce's gun, which was the murder weapon (*Id.*, transcript p. 750). "A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative." *Van Poyck v. Florida Dep't. of Corrs.*, 290 F.3d 1318, 1324 n. 7 (11th Cir.2002) (citation omitted). Moreover, there was substantial evidence of Petitioner's guilt under the felony murder theory.

Petitioner has failed to demonstrate that the state court unreasonably applied federal law or made an unreasonable determination of the facts in denying this claim. Accordingly, Ground Two, Subclaim d does not warrant federal habeas relief.

### Subclaim e

Petitioner complains that trial counsel was ineffective in failing to obtain Butterfield and Brittingham's grand jury testimony to establish that said testimony was inconsistent with their trial testimony. Petitioner does not identify any inconsistent testimony. Rather, he asserts that in light of pre-trial statements Butterfield and Brittingham gave to law enforcement and prosecutors that were inconsistent with their trial testimony, "[i]t is inevitable" that they gave testimony before the grand jury that was inconsistent with their trial testimony. He contends that their trial testimony was crucial to the State's case, and any inconsistent testimony 1) could have been used to impeach their credibility, and 2) could have changed the outcome of the trial.

In state court, Petitioner raised this claim as Ground 3, Subclaim 8 of his Amended Rule 3.850 motion (Respondent's Ex. 16). In denying the claim, the state post-conviction court determined that the claim was speculative because "[Petitioner] does not argue, and the record is absent of any indication that these witnesses gave conflicting discoverable grand jury testimony."

(Respondent's Ex. 17, p. 18).

Neither in state court nor in this Court has Petitioner identified grand jury testimony from Butterfield and Brittingham that was inconsistent with their trial testimony. Moreover, Petitioner has not even alleged that they gave testimony before the grand jury that was inconsistent with their trial testimony. Rather, he contends "it is inevitable" that their grand jury testimony was inconsistent with their trial testimony because they gave inconsistent statements to law enforcement prior to trial. This contention is wholly speculative and therefore insufficient to demonstrate either deficient performance by counsel or prejudice. *See Johnson*, 256 F.3d at 1183 ("pure speculation" is insufficient to demonstrate ineffective assistance of counsel).

The state post-conviction court's rejection of this claim was not an unreasonable application of *Strickland*. Accordingly, Ground Two, Subclaim 5 does not warrant federal habeas relief.

**Subclaim f**

Petitioner contends that counsel was ineffective in failing to object to Tuttle's testimony that Pearce committed a sexual battery on Tuttle. Petitioner asserts that counsel should have objected and argued that the testimony was 1) irrelevant because the sexual battery occurred before Petitioner first arrived to meet Pearce, and 2) overly prejudicial because its only purpose was to inflame the passion of the jury.

In state court, Petitioner raised this claim as Ground 3, Subclaim 9 of his Amended Rule 3.850 motion (Respondent's Ex. 16). In denying the claim, the state post-conviction court stated:

> Here, Defendant alleges counsel was ineffective for failing to object when the State introduced testimony from Tuttle regarding the sexual battery. Defendant argues that the testimony regarding the sexual battery was not relevant

to Defendant's charges and was highly prejudicial. He claims that, but for counsel's failure, there is a reasonable probability that the outcome of the trial would have been different.

The Court finds that the Defendant has failed to establish that counsel was deficient. First, the Defendant and Pearce were charged as principals to the murder and attempted murder pursuant to §777.011, Florida Statutes. *See Exhibit A: Indictment*. Therefore, evidence of Pearce's actions was admissible in the Defendant's trial to prove the case. See State v. Dene, 533 So. 2d 265 (Fla. 1988). The State had to prove that Defendant committed first degree murder and attempted murder. To prove first degree murder, the State argued both premeditated murder and felony murder. *See Exhibit B. Trial Transcript, pp. 770-771.* As to felony murder, the State had to establish that the victim's death occurred during the Defendant's commission of the kidnapping and that Defendant or another killed the victim while acting as principals to the kidnapping. *See Exhibit B: Trial Transcript, p. 773-774.* The State also explained the principal theory to the jury. *Trial Transcript, pp. 776-777.* As Defendant was charged as a principal, the State could establish his guilt by presenting testimony as to Pearce's activities. The sexual battery was part of the entire criminal episode, specifically the acts leading up to the kidnapping and Pearce's motive. The Florida Supreme Court reversed the trial court's ruling which found that trial counsel was ineffective for failing to object or move to exclude the sexual battery incident. State v. Pearce, 994 So. 2d 1094 (Fla. 2008). Furthermore, the Court in Smith v. State, 866 So. 2d 51, stated that "proof of any fact with its circumstances even though amounting to a distinct crime is admissible if it has some relevant bearing upon the issue being tried". The Florida Supreme Court explained that "[t]he only limitations to the rule of relevancy are that the state should not be permitted to make the evidence of other crimes a feature of the trial." Therefore, evidence of uncharged crimes which are inseparable from the crime charged or evidence which is "inextricably intertwined" with the crime charged is admissible under § 90.402, Florida Statutes, because it is relevant and inseparable from the crime charged. Smith v. State, 866 So. 2d at 52. The sexual battery was part of one criminal episode which led to the death of Crawford and the attempted murder of Tuttle. Therefore, the State was entitled to present evidence to establish the entire context out of which the crimes arose. Defense counsel did not have grounds to object to the testimony because Defendant and Pearce were charged as principals. Therefore, defense counsel is not ineffective for failing to make a groundless objection. Freeman v. State, 761 So. 2d 1055 (Fla. 2000).

The Court also finds that the Defendant cannot show prejudice in this claim. The Florida Supreme Court has already ruled on the prejudicial aspect of the sexual battery testimony, and this ruling has become the law of the case. Pearce v. State, 994 So. 2d at 1099. The Court found that the evidence of the sexual assault "did not become the feature of the trial and was simply one act in a

series that led to the murder and attempted murder."

In the instant case, the words "sexual battery" were not even spoken during the State's closing argument. The only mention of the incident was when the State discussed Pearce holding the victims hostage and stated "[Pearce] forced Steve Tuttle to commit acts against his will at the point of this gun." *Exhibit B: Trial Transcript, p. 783.* Also, the only other mention of the sexual battery incident during the entire trial was once during the testimony of Tuttle. *Trial Transcript, p. 399-400.* Therefore, the sexual battery testimony in Defendant's trial was even more limited than in Pearce's trial. *See Pearce v. State.* 994 So. 2d 1100. This Court finds that the sexual battery was intertwined with the crimes charged and did not become a feature of Defendant's trial. Given all of the other evidence against Defendant, as outlined in this order and the Court's August 22, 2011 order, it is unlikely that this testimony affected the outcome of the trial. This claim is denied.

(Respondent's Ex. 21, pp. 2-4).

The state post-conviction court found that Tuttle's testimony regarding the sexual battery was admissible under Florida law, and had counsel objected to the testimony as irrelevant and overly prejudicial, the objection would have been overruled. The state post-conviction court therefore concluded that Petitioner failed to show deficient performance and prejudice.

The state post-conviction court therefore has answered the question of what would have happened had defense counsel objected to Tuttle's testimony regarding the sexual battery - the objection would have been overruled under Florida law. Consequently, Petitioner has failed to establish deficient performance and prejudice.[5] *See, Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) (Alabama Court of Criminal Appeals had already answered the question of what would have happened had counsel objected to the introduction of petitioner's statements based

---

[5]Federal courts "will grant [habeas] relief if. . .a state trial judge's erroneous admission of evidence makes a petitioner's trial 'so fundamentally unfair that the conviction was obtained in violation of the due process clause of the fourteenth amendment[.]'" *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1355 n.8 (11th Cir. 2005) (quoting *Thigpen v. Thigpen*, 926 F.2d 1003, 1012 (11th Cir. 1991)). Petitioner has not established that the admission of the testimony regarding Pearce's sexual battery rendered the trial fundamentally unfair. As the state court stated, the testimony regarding the sexual battery was intertwined with the series of events and was not a feature of the trial.

on state decisions; the objection would have been overruled; therefore, counsel was not ineffective for failing to make that objection). Moreover, Petitioner has failed to demonstrate prejudice because he has not shown that had counsel objected, the objection would have been sustained, and that exclusion of the testimony would have carried a reasonable probability of changing the outcome of the trial.

Petitioner therefore has failed to show that the state court's denial of this claim involved an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts. Accordingly, Ground 2, Subclaim f does not warrant federal habeas relief.

**Subclaim g**

Petitioner contends that trial counsel was ineffective in failing to object to, or request a curative instruction regarding, allegedly improper comments made by the prosecutor during closing argument. Specifically, he asserts that the prosecutor improperly invited the jury to speculate regarding what he was insinuating when he questioned crime scene technician Lana Whonsetter. Petitioner contends that the prosecutor was insinuating that gun residue testing is neither reliable nor useful. He argues that the comments were improper because it allowed the jury to consider facts not in evidence.

In state court, Petitioner initially raised this claim in Ground 3, Subclaim 10 of his Amended Rule 3.850 motion (Respondent's Ex. 16, p. 22). After the claim was stricken with leave to amend (Respondent's Ex. 17, pp. 18-19), Petitioner filed his amended claim (Respondent's Ex. 18). In denying the amended claim, the state post-conviction court stated:

> In this claim, as amended, Defendant alleges counsel failed to object when the State made an improper closing argument by asking the jury to "speculate" about evidence and testimony. The Court finds that the claim is, for the most part, incomprehensible. To the extent that the Court discerns claims, the Court addresses the claims as follows:

54

First, the Defendant appears to allege that the State asked the jury to speculate about the results of the State's gunshot residue test. However, the record refutes this claim. The Defendant's defense at trial was that Pearce shot the victims and there was a lack of evidence establishing Defendant's participation in the murder and attempted murder. In the closing statement, counsel for Defendant argued that since the State did not introduce the result of the gunshot residue test performed on Defendant, it means the test was negative. *Trial Transcript, pp. 750-751*. In response to this defense, the State argued in closing that defense counsel was actually asking the jury to speculate that the test was negative because it was not introduced. The State argued that the jury should not speculate and asked them to review only the testimony and evidence in reaching a verdict. The State then offered examples of speculation on the evidence. *Trial Transcript, p. 781-783*. The record indicates that defense counsel asked the jury to assume that the gunshot residue test was negative and the State asked the jury not to speculate and to only consider the evidence. The court is unaware of what objection defense counsel could have reasonably made to the State's closing argument. Therefore, counsel is not ineffective for failing to make a groundless objection.

Defendant also appears to allege that counsel was ineffective for failing to object to the State's reference during closing arguments to facts not in evidence. As stated previously, Defense counsel implied that the State did not introduce gunshot residue test results from Defendant's hands because they were negative. In response to Defendant's position that the gunshot residue test must have been negative, the State responded during closings argument that when Defendant was arrested he was "wet, rolling around in the mud and rain in his front yard", implying perhaps that the rain washed away the gunshot residue. *Trial Transcript, p. 781-783*. However, Detective Bucenell had testified that he arrested Defendant on a rainy day and that everyone got wet. He testified that when handcuffed, the Defendant was "face down on the ground, in the rain...". *Trial Transcript, p. 653*. Therefore, the State referred to facts that were in evidence. Accordingly, this claim is refuted in the record. Further, counsel cannot be ineffective for failing to object when there are no grounds for objection.

The Court also finds that Defendant has failed to establish how the result of the trial would have been different if the above-referenced objections had been made and sustained. In light of the other overwhelming evidence and testimony implicating the Defendant in this case (as described in the Court's August 22, 2011 Order), the Court finds that Defendant has failed to establish any prejudice from counsel's lack of objection. This claim is denied.

(Respondent's Ex. 21, pp. 4-5).

The state court has answered the question of what would have happened had counsel

objected to the prosecutor's comments during closing argument—the objection would have been overruled. Consequently, Petitioner has failed to establish deficient performance or prejudice with respect to this claim. *See Callahan*, 427 F.3d at 932 (Alabama Court of Criminal Appeals had already answered the question of what would have happened had counsel objected to the introduction of petitioner's statements based on state decisions; the objection would have been overruled; therefore, counsel was not ineffective for failing to make that objection).

During closing argument, defense counsel stated, in pertinent part:

He wasn't given a gunshot residue test, which now, you know, the police give in order to find out if there's evidence of gunshot powder. And now the State will suggest to you that it's really not a significant thing to do. It's really not important. But the police decided to give it to Mr. Smith, which we never heard the - - we certainly would have heard if the results were positive. The results were negative.

\*\*\*

You heard the testimony, as we have talked about, of several crime scene technicians, about recovering, processing the crime scene, recovering bullets.

The gunshot residue test was performed on Mr. Smith. The technician testified that Mr. Smith cooperated fully. And again, somehow, because it's negative, it's - - that whole process is insignificant, unimportant. But it was certainly not done on Faunce Pearce, or Heath Brittingham, or Teddy Butterfield.

(Respondent's Ex. 36, transcript pp. 739, 750-51).

In response to those statements, the prosecutor argued:

Speculative doubt, imaginary doubt, forced doubt, what does all that mean? I will tell you what. For instance, gunshot residue. You heard evidence about a gunshot residue test. It was performed on the hands of Lawrence Joey Smith. Granted, nobody else had one done. That's for you to consider. But you have no evidence of the results.

Mr. Hernandez says that since it wasn't introduced, it must have been negative. That's speculation. The evidence is is [sic] that a test was given. There is no evidence of the results.

I mean, if you wanted to speculate, I asked Miss -- I believe it was Weigand -- "Do you know how reliable the test is?  Do you know if it's even done anymore?"

Well, what can you speculate from the nature of those questions?

What can you speculate from the fact that at the time this guy was taken into custody he was wet, rolling around in the mud and the rain in his front yard? What can you speculate from that?

Your evidence is the test was given.   Don't speculate.   Your verdict has to be based upon the evidence.

(*Id*., transcript pp. 782-83).

"A prosecutor is not limited to a bare recitation of the facts, but instead, may comment on the evidence. . . ."   *Crenshaw v. Sec'y, Fla. Dep't of Corr.*, 2017 WL 6761058, at *6 (11th Cir. Oct. 18, 2017) (unpublished) (citation omitted).   The prosecutor properly and accurately commented on the evidence when he stated that no evidence had been presented showing the results of the gunshot residue test on Petitioner.   And his comment that defense counsel was merely speculating when he stated that the result of the test was negative was a fair response to the evidence and defense counsel's comment "And again, somehow, because [the test was] negative, it's – that whole process is insignificant, unimportant."   *See id*. ("[T]he prosecutor 'as an advocate, is entitled to make a fair response to the arguments of defense counsel.'") (quoting *Holland v. Florida*, 775 F.3d 1294, 1318 (11th Cir. 2014)).   Moreover, the prosecutor's comments regarding the jury speculating as to the validity of the test was an invited response to defense counsel's speculation as to the result of the test, and his comment that the State was implying that the test was "insignificant" and "unimportant" only because it came back negative. *See id*. ("When a prosecutor's comments are an 'invited reply' in response to defense counsel's remarks, and he does 'no more than respond substantially in order to 'right the scale,' such

comments would not warrant reversing a conviction.'") (quoting *United States v. Young*, 470 U.S. 1, 11–13 (1985)).   Finally, despite Petitioner's argument to the contrary, the prosecutor did not invite the jury to speculate whether a gunshot residue test is reliable.   Rather, the prosecutor argued that although the jury could speculate about several issues (including the reliability of the test), they should not speculate but rather return a verdict "based upon the evidence."

Because the prosecutor's comments were not improper, Petitioner has failed to demonstrate that the state court's resolution of this claim was an unreasonable application of *Strickland* or based on an unreasonable determination of the facts. Accordingly, Ground Two, Subclaim g does not warrant federal habeas relief.

**Subclaim h**

Petitioner contends that trial counsel was ineffective in failing to object to an erroneous ruling by the trial court.   Petitioner asserts that Butterfield's testimony that he saw Petitioner and co-defendant Pearce switch guns prior to the shooting placed the murder weapon with Petitioner. When trial counsel attempted to impeach Butterfield by asking him why he failed to mention the swapping of guns in his prior statements to law enforcement, the court sustained the State's objection that it was improper impeachment.   Petitioner contends that counsel should have argued that his question was proper impeachment and "recite[d] the proper law" in support. Petitioner further contends that because the court erroneously ruled that defense counsel's attempt to impeach Butterfield was improper, counsel never attempted to impeach Brittingham's testimony that he too saw Petitioner and Pearce switch guns with Brittingham's prior statements that omitted this fact.   Finally, he claims that he was prejudiced by counsel's failure to object to the ruling because the issue was not preserved for appeal.

This claim was raised in state court in Ground 3, Subclaim 5 of his Amended Rule 3.850

motion (Respondent's Ex. 16, pp. 15-16).    In denying the claim, the state post-conviction court

stated:

> Defendant claims defense counsel failed to "object to the trial court's erroneous ruling or correct prosecutor's misstatement of law, allowing critical testimony on material fact at issue to go unrebutted."    Butterfield testified that he saw Defendant and Pearce trade guns.    During cross-examination, defense counsel attempted to impeach him with a prior inconsistent statement.    Butterfield denied making the prior statement and insisted that he had stated previously that Defendant and Pearce switched guns.    Counsel attempted to introduce Butterfield's prior written statement into evidence to impeach his trial testimony. *Trial transcript, p. 457-459.*

> This Court finds that this was incomplete impeachment and that the court's ruling that the impeachment was improper was a correct ruling. After Butterfield denied making the inconsistent statement, impeachment would be accomplished by calling as a witness the individual to whom the statement had been made.    Nevertheless, counsel cannot be ineffective for failing to argue with the Judge or object to a correct ruling by the Judge.    This claim is refuted by the record and is, therefore, denied.

(Respondent's Ex. 17, p. 15).

The state post-conviction court determined that the state trial court correctly sustained the

State's objection and that defense counsel's impeachment was improper under Florida law.    "It

is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas

courts should not second-guess them on such matters.'"    *Herring v. Sec'y, Dep't of Corr.*, 397

F.3d 1338, 1355 (11th Cir. 2005) (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th

Cir.1997)).    Therefore, the state courts have answered the question of what would have

happened had counsel attempted to challenge the state trial court's ruling that his method of

impeachment was improper—his argument would have been rejected, and the State's objection

would have been sustained.    Consequently, Petitioner has failed to establish deficient

performance by counsel.    *See Callahan v. Campbell*, 427 F.3d at 932.    Accordingly, the state

court's ruling did not result in an unreasonable application of federal law, and Ground 2,

Subclaim h warrants no federal habeas relief.

**Subclaim i**

Petitioner complains that trial counsel was ineffective in failing to present an alternate defense theory, namely, that Butterfield shot the victims. Petitioner asserts that there was "an abundance of evidence available to counsel" which pointed to Butterfield as the shooter, including: 1) in pre-trial statements Butterfield: a) referred to the stolen money as "ours" (meaning his and Pearce's), which showed he had a motive to shoot the victims; b) stated that Pearce had called him "to retrieve their lost money and asked him to bring a gun"; c) stated that he and Pearce had previously "discussed what to do in this type of situation"; d) admitted that he and Pearce were drug dealing partners for a while; e) stated that he was seated in the rear of the car behind the passenger seat, which showed that he was seated in a position that would allow him to exit the vehicle, and was inconsistent with his trial testimony that he was seated in the rear of the car behind the driver's seat; f) indicated that "after seperating [sic] from Petitioner and Pearce" he "opted to remain at Pearce's residence in order to keep an eye on things and gauge whether or not it was safe for Pearce to return," which suggests he was "trying to cover a crime" rather than "a scared witness to a senseless homicide"; 2) Tanya Barcom's pre-trial statement that her drug dealer told her that the money she stole belonged to Pearce and Butterfield; and 3) Petitioner is 5'10" tall, Butterfield is 5'3" tall, and the medical examiner's autopsy report and photographs "strongly suggested" that the first gunshot wound sustained by Crawford, who was 5'11", was made by someone significantly shorter than Petitioner. Petitioner argues that had counsel presented this evidence during trial, the outcome of the trial would have been different.

In state court, Petitioner raised this claim in Ground 3, Subclaim 7 of his Amended Rule 3.850 motion (Respondent's Ex. 16, pp. 19-21). In denying the claim, the state post-conviction court stated:

Defendant alleges counsel was deficient because he failed to investigate or present an "alternate theory" that Butterfield was the "true perpetrator of the crime". Defendant claims that there was substantial available evidence not used by counsel to present this theory at trial. However, the defense's theory at trial was that although Defendant was present in the car, Pearce was the shooter and Brittingham and Butterfield were covering for Pearce by naming Defendant as the shooter. Nevertheless, defense counsel stressed during closings all the evidence and testimony he claimed showed that Butterfield could have been the shooter and wondered whether Butterfield was covering up for Pearce or for himself. *Trial transcript, p. 731*. Accordingly, this claim is refuted by the record. This claim is denied.

(Respondent's Ex. 17, pp. 17-18).

The state post-conviction court's denial of this claim was not objectively unreasonable. The court correctly found that Petitioner's theory of defense was that Pearce shot the victims and Brittingham and Butterfield, who were more closely acquainted with Pearce than Petitioner, identified Petitioner as the shooter to cover for Pearce (*See, e.g.*, Respondent's Ex. 36, transcript pp. 731, 738). Petitioner has failed to show that no competent counsel would have pursued this theory of defense and foregone a theory that Brittingham shot the victims. *See, Chandler*, 218 F.3d at 1315 ("[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take.") (citations omitted). This is especially true considering that the evidence established that the victims were shot with Pearce's gun (*see* Respondent's Ex. 35, transcript pp. 634-36; Ex. 36, transcript p. 722), and there was no evidence that Butterfield was ever in possession of Pearce's gun.[6] And to the extent Petitioner argues that Butterfield had a motive to kill the victims because there was evidence that showed it was both Butterfield and Pearce's money that was stolen, Pearce had the same motive.

---

6 Both Brittingham and Butterfield testified that Petitioner was in possession of Pearce's gun shortly before the victims were shot (*See* Respondent's Ex. 34, transcript pp. 430, 472).

Petitioner contends that defense counsel should have presented an alternate theory that Butterfield shot the victims because he is much shorter than Crawford, and the autopsy report and photographs "strongly suggested" that Crawford was shot by someone significantly shorter. This conclusion, however, is not supported by any evidence, let alone expert testimony, that the shooter was "significantly shorter" than Crawford.   In fact, the medical examiner testified that in light of Crawford's wounds, the shooter could have been in "many potential positions" (*i.e.*, "standing, crouching, lying down") when shooting Crawford (Respondent's Ex. 35, transcript p. 609), which could be one explanation for an upward trajectory of the bullet. And to the extent that Petitioner argues that the shooter had to be "significantly shorter" than Crawford because the State's witnesses testified that "Crawford and the shooter were standing erect" when Crawford was first shot (Doc. 1, docket p. 35), his argument is belied by the record.   Butterfield testified that he only heard the two shots because it was too dark to see (Respondent's Ex. 34, transcript p 432, 453).   And Brittingham testified that he "couldn't see" Crawford when Petitioner first shot him.   Rather, he heard Crawford say, "No. Please don't" before he was shot and then heard Crawford "hit the ground." (*Id*., transcript p. 476).   And during cross-examination when Brittingham was asked whether he could see Tuttle and Crawford when they were out of the car, he answered "No, not really." (*Id*., transcript p. 494).   Finally, even if there was evidence that showed the shooter was shorter than Crawford, Petitioner alleges that Pearce was significantly shorter (5'6") than Crawford (5'11") (*see* Doc. 1, docket p. 27).   The evidence therefore would have equally supported defense counsel's theory that Pearce shot Crawford.

Petitioner has failed to demonstrate that the state court's resolution of this claim was an unreasonable application of *Strickland* or based on an unreasonable determination of the facts. Accordingly, Ground Two, Subclaim i does not warrant federal habeas relief.

**Subclaim j**

Petitioner contends that trial counsel was ineffective in failing to challenge the validity of the Indictment on the ground that is was not drafted, signed, and filed by an individual authorized to do so.   In state court, Petitioner raised this claim as Ground 3, Subclaim 1 of his Amended Rule 3.850 motion (Respondent's Ex. 16, pp. 4-5).   In denying the claim, the state court stated:

> . . .Defendant claims that his trial counsel was ineffective by failing to file a motion to "challenge the validity" of the indictment on the grounds that it was drafted, signed and filed by an individual, Bruce Bartlett, who is not authorized to sign indictments. . . .However, Bruce Bartlett, Esquire, is an assistant state attorney appointed by the Sixth Judicial Circuit State Attorney, qualified to sign felony indictments in the Sixth Judicial Circuit.   See § 27.181(2), Fla. Stat. (2010).   Further, Defendant does not allege how counsel's failure to file a motion challenging the indictment affected the outcome of his trial.   Counsel cannot be ineffective for not filing a motion that lacks legal merit and will fail. . . .This claim is, therefore, denied.

(Respondent's Ex. 17, pp. 2-3).

The state post-conviction court found that Bartlett was qualified to sign the Indictment, and had counsel filed a motion challenging the validity of the Indictment on the ground that it was not signed by an authorized individual, the motion would have been denied. The state post-conviction court therefore concluded that Petitioner failed to show deficient performance and prejudice.

The state post conviction court has answered the question of what would have happened had defense counsel moved to dismiss the Indictment - the motion would have been denied. Consequently, Petitioner has failed to establish deficient performance and prejudice.   *See, Callahan*, 427 F.3d at 932.

Petitioner appears to contend that the state court's decision is based on an unreasonable

determination of the facts. He argues that Bartlett was not qualified to sign the Indictment because he never signed a written oath affirming that he would faithfully perform his duties as an assistant state attorney, and never filed the oath with the clerk of the circuit court, as required by Fla. Stat., Section 27.181. Section 27.181 provides, in pertinent part, that:

> 1) Each assistant state attorney appointed by a state attorney shall serve during the pleasure of the state attorney appointing him or her. Each such appointment shall be in writing and shall be recorded in the office of the clerk of the circuit court of the county in which the appointing state attorney resides. No such appointee shall perform any of the duties of assistant state attorney until he or she shall have taken and subscribed to a written oath that he or she will faithfully perform the duties of assistant state attorney and shall have caused the oath to be recorded in the office of the clerk of the circuit court of the county in which the appointing state attorney resides. Upon the recordation of such appointment and oath, the appointing state attorney shall promptly cause certified copies thereof to be transmitted to the Secretary of State. When any such appointment shall be revoked, the revocation thereof shall be made in writing and shall be recorded in the office of the clerk of the circuit court of the county in which the appointment is recorded, and the state attorney executing the revocation shall forthwith cause a certified copy thereof to be transmitted to the Secretary of State. If any such appointee dies or resigns, the appointing state attorney shall promptly give written notice of such death or resignation to the Secretary of State.

> (2) Each assistant state attorney appointed by a state attorney shall have all of the powers and discharge all of the duties of the state attorney appointing him or her, under the direction of that state attorney. No such assistant state attorney may sign informations unless specifically designated to do so by the state attorney. He or she shall sign indictments, informations, and other official documents, as assistant state attorney, and, when so signed, such indictments, informations, and documents shall have the same force and effect as if signed by the state attorney.

Petitioner asserts that he contacted the clerk of the courts for both Pinellas County and Pasco County, Florida, and they had records showing Bartlett was designated as an assistant state attorney, but no record of his oath of office (*see* Respondent's Ex. 10, p. 13). This fails to show by clear and convincing evidence that Bartlett never took his oath or failed to file it with the courts. Accordingly, Petitioner fails to demonstrate that the state courts' denial of this claim was based on an unreasonable determination of the facts.

Moreover, Petitioner has failed to demonstrate prejudice because he has not shown that, had counsel moved to dismiss the Indictment, the motion would have been granted. Additionally, even assuming that defense counsel should have moved to dismiss the Indictment, there is no reasonable possibility that counsel's motion to dismiss the Indictment would have changed the results of the trial. Assuming that defense counsel moved to dismiss the Indictment, and the court granted the motion, the court would have allowed the State the opportunity to correct and refile the Indictment. *See Carroll v. State*, 251 So. 2d 866, 870 (Fla. 1971) ("If an indictment or information is quashed or dismissed the state must then elect to either appeal or refile, or pursue both remedies, if available."). Once the State refiled the Indictment signed by a qualified attorney, Petitioner would have faced the same charges, and there is no reasonable basis to believe the outcome would have been different.

Petitioner has failed to show that the state courts' denial of this claim involved an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts. Accordingly, Ground 2, Subclaim i does not warrant federal habeas relief.

**Subclaim k**

Petitioner argues that he is entitled to relief because of the cumulative effect of counsel's alleged errors. Considering there is no Supreme Court precedent applying the cumulative error doctrine to claims of ineffective assistance of counsel, this Court cannot say that the state court's rejection of Petitioner's claim is contrary to or an unreasonable application of clearly established federal law. *See Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1287-88 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established

federal law."); *Hill v. Davis*, 781 F. App'x 277, 280–81 (5th Cir.), *cert. denied*, 140 S. Ct. 389 (2019) ("The Supreme Court has never squarely held that the cumulative error doctrine governs ineffective assistance of counsel claims.").   The Supreme Court has held, however, in relation to an ineffective assistance of counsel claim, that "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt."   *Id*. at 564-65 (quoting *United States v. Cronic*, 466 U.S. 648, 659 n.26 (1984)).   Petitioner has not met his burden to show that he is entitled to relief on any of the ineffective assistance claims presented in his federal habeas petition. Accordingly, he cannot show that relief is warranted on his claim of cumulative error.   Ground 2, Subclaim k therefore warrants no relief.

**Ground Three**

Petitioner contends that the State failed to disclose a deal it made with Butterfield, one of two witnesses who identified Petitioner as the shooter, in exchange for his testimony against Petitioner.   Specifically, he alleges that Butterfield "made a deal with law enforcement officers to avoid prosecution," and at a pretrial hearing, the state attorney denied that any deal existed after failing in its duty to learn of Butterfield's deal with law enforcement (Doc. 1, docket p. 39). He argues that the State's misconduct violated *Brady v. Maryland*, 373 U.S. 83 (1963).   He further argues that the State committed a violation under *Giglio v. United States*, 405 U.S. 150 (1972), by 1) allowing Butterfield to falsely testify that he had no incentive to testify against Petitioner, and 2) misleading the jury during closing argument in stating that Butterfield had no reason to falsely testify against Petitioner.

This claim was presented in state court in Ground 4 of Petitioner's Rule 3.850 motion (Respondent's Ex. 16 pp. 23-24).   In denying the claim, the state post-conviction court stated:

Defendant claims that the state committed <u>Brady</u> and <u>Giglio</u> violations by suppressing that a witness, Butterfield, "made a deal with law enforcement" to avoid criminal charges and that that the prosecutor misled the jury on this issue during closing arguments. The Defendant claims he was prejudiced because Butterfield's credibility was an important issue and there was a reasonable probability that the outcome of the trial would have been different if the state had disclosed this evidence. To claim a <u>Brady</u> violation, a defendant must show (1) that the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence was suppressed by the state, either willfully or inadvertently; and (3) prejudice ensued. Under the prejudice prong, the defendant must show that the suppressed evidence is material. <u>Reed v. State</u>, 875 So. 2d 415 (Fla. 2004); <u>citing</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 282-82 (1999). To establish prejudice or materiality under <u>Brady</u>, a defendant must demonstrate a reasonable probability that in light of the entire record the jury verdict would have been different had the suppressed information been used at trial.

First, Defendant does not describe the purported deal made by law enforcement with Butterfield. However, Defendant was clearly aware that law enforcement had determined to seek assistance from Butterfield rather than charging Butterfield with the instant crimes. According to Defendant's own motion, Butterfield and Brittingham offered numerous statements and gave depositions regarding Defendant's involvement in this case. Further, during the course of the trial, Butterfield testified in detail about his role in the shootings and admitted that he had not been charged with these crimes. *Trial transcript, p. 419-461*. The record is, therefore, clear that Defendant possessed at trial the evidence he now claims the State withheld in violation of <u>Brady</u>. Accordingly, Defendant cannot demonstrate that he was prejudiced by the state not specifically disclosing an alleged deal made with this witness. This claim lacks merit and is denied.

To prove a <u>Giglio</u> violation it must be shown that (l) some testimony at trial was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material. <u>See Craig v. State</u>, 685 So. 2d 1224 (Fla. 1996). The Defendant alleges that the prosecutor misled the jury by arguing that Butterfield had no reason to lie when testifying. First, the Defendant has failed to allege or demonstrate that any of Butterfield's testimony was false. In fact, Defendant does not even allege that Butterfield gave false testimony but instead claims that the prosecutor "misled the jury". Substantive claims of prosecutorial misconduct could and should have been raised on direct appeal and thus are procedurally barred from consideration in a postconviction motion. *Spencer v. State*, 842 So. 2d 52, 60 (Fla. 2003).

Accordingly, the Defendant has failed to show that Butterfield gave false testimony, that the State knew that the testimony was false or that the testimony

was material.    This claim lacks merit and is denied.

(Respondent's Ex. 17, pp. 19-20) (footnotes omitted).

### 1. Analysis of *Brady*[7] claim

"*Brady* requires the state to disclose material exculpatory evidence in its possession. The duty to disclose required by *Brady* includes the disclosure of evidence that may be used for impeachment purposes and evidence that may be used to attack the thoroughness and even the good faith of the investigation[.]"    *Consalvo v. Secretary for Department of Corrections*, 664 F.3d 842, 844–45 (11th Cir.2011) (quotation and citation omitted) (alteration in original).    To obtain relief on his *Brady* claim, Petitioner must "establish (1) the government possessed evidence favorable to him; (2) the defendant did not possess the evidence and could not have obtained it with reasonable diligence; (3) the government suppressed the favorable evidence; and (4) the evidence was material." *Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 941 (11th Cir.2009) (quotation omitted). "Evidence would be material if it is reasonably probable that a different outcome would have resulted if the government had disclosed the evidence.    A reasonable probability is a probability sufficient to undermine confidence in the outcome."    *Ferguson v. Sec'y for the Dep't of Corr.*, 580 F.3d 1183, 1205–06 (11th Cir.2009) (quotations and citation omitted).

Under those requirements, Petitioner's *Brady* claim clearly fails.    The state post-conviction court correctly found that Petitioner "was clearly aware that law enforcement had determined to seek assistance from Butterfield rather than charging Butterfield with the instant crimes."    Petitioner contends that in Butterfield's March 26,

2001 deposition, he admitted to making a deal with law enforcement to avoid prosecution (*See* Doc. 56, Ex. 5, transcript pp. 29-30). That deposition, at which defense counsel was present and questioned Butterfield, was taken before Petitioner's trial in May 2001. Accordingly, because Petitioner's attorney knew about Butterfield's alleged deal with law enforcement before trial, the evidence was not "suppressed," and there was no *Brady* violation. *See Felker v. Thomas*, 52 F.3d 907, 910 (11th Cir.), *opinion supplemented on denial of reh'g*, 62 F.3d 342 (11th Cir. 1995) ("We have held numerous times that there is no suppression, and thus no *Brady* violation, if either the defendant or his attorney knows before trial of the allegedly exculpatory information.").

Even if the "deal with law enforcement" was suppressed by the State, it was not material. During his deposition, Butterfield testified that there was no agreement that he would not be prosecuted in exchange for his testimony (*Id*.). At worst, he testified that while he was interrogated, law enforcement said it would benefit him to tell the truth (*Id*.). This was not an agreement between Butterfield and law enforcement that Butterfield would not be prosecuted in exchange for his cooperation. Rather, it was an interrogation tactic employed by the officers to convince Butterfield that he should cooperate. Accordingly, Petitioner's *Brady* claim fails because there is no reasonable probability that the outcome of the trial would have been different, since there is no indication that there was a deal between the State and Butterfield, and that a deal was suppressed. *See Bradley v. Nagle*, 212 F.3d 559, 566 (11th Cir. 2000) ("Under *Brady*, excluded evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'")

---

7 *Brady v. Maryland*, 373 U.S. 83 (1963).

(quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

### 2. Analysis of *Giglio* claim[8]

Petitioner contends that after Butterfield testified falsely, the prosecutor misled the jury during closing argument by stating that Butterfield had no reason to lie to law enforcement. He argues that this was a *Giglio* violation because Butterfield had a reason to lie, namely, to avoid having the State bring criminal charges against him.

In *Giglio*, the Supreme Court held that when the prosecution solicits or fails to correct known false evidence, due process requires a new trial when "the false testimony could in any reasonable likelihood have affected the judgment of the jury." 405 U.S. at 154 (quotation and citation omitted) (ellipsis omitted). "*Giglio* error is a species of *Brady* error that occurs when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury." *Ventura v. Attorney Gen., Fla.*, 419 F.3d 1269, 1276–77 (11th Cir.2005) (quotation and citation omitted). "To establish a *Giglio* claim, a habeas petitioner must prove: '(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, i.e., that there is any reasonable likelihood that the false testimony could ... have affected the judgment.'" *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1348 (11th Cir. 2011) (quoting *Ford v. Hall*, 546 F.3d 1326, 1332 (11th Cir.2008)).

This claim warrants no relief because Petitioner fails to demonstrate that Butterfield's testimony was perjurious. Petitioner alleges (*see* Doc. 1, docket p. 39) the following testimony by Butterfield was false:

Q.      Are you contacted by law enforcement?

A.      Yes, sir. I was - - when I was asleep in Faunce's bed - - because Faunce asked me to stay at his house until he would give me a call, and I was supposed to let him know if the heat was up or down or whatever - - and then I was woke up four or five hours later, at gunpoint.

Q.      By the Pasco County Sheriff's Office?

A.      Yes, sir.

Q.      Were you interviewed by detectives from the Pasco County Sheriff's Office?

A.      Yes, sir, I was.

Q.      And did you originally tell them what you were telling the members of this jury here today?

A.      No, sir.

Q.      Did you lie to them?

A.      Yes, sir.

Q.      What did you tell them?

A.      I told them - - first I told them I didn't even – Faunce said, "Pull over," on 41, before we even made it to 54, and asked us if anybody was down with this, if they wanted out, they could get out, if they wasn't sure they wanted to go up to the house and do this.    And I told them I got out of the car.

Q.      Okay.    Did you tell them anything else?

A.      I think I told them a couple of different things, yes, sir, but I don't - - I forget what I said.

Q.      All right.    Did you ultimately tell them what you told the members of this jury?
A.      Yes, sir.

Q.      Did you cooperate with the investigation in this case?

---

8 *Giglio v. United States*, 405 U.S. 150 (1972).

A.    Yes, sir, I did.

Q.    Did you take the detectives to the Howard Franklin bridge where the gun was thrown?

A.    Yes, sir. I did.

Q.    Did you show them where the gun was thrown?

A.    Yes, sir.   I showed them at what point in the bridge the gun was thrown from, and we also took them to where the kids were shot at.

(Respondent's Ex. 34, transcript pp. 438-39).

Petitioner has failed to explain how any of the above testimony is false.   Moreover, nowhere in that testimony did Butterfield state or imply that he did not agree to cooperate with law enforcement in exchange for a promise not to press charges against him.   Therefore, because Petitioner has failed to demonstrate that the State solicited or failed to correct false testimony from Butterfield, his *Giglio* claim fails.   *See Rodriguez v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1277, 1302 (11th Cir. 2014) ("A *Giglio* violation occurs when the prosecution solicits or fails to correct false or perjured testimony and 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury.'") (citation and quotation marks omitted).

The state court's resolution of Petitioner's *Brady* and *Giglio* claims was neither contrary to nor an unreasonable application of clearly established federal law.   Accordingly, Ground Three warrants no federal habeas relief.

**Ground Four**

Petitioner contends that newly discovered evidence casts doubt on his conviction.   He asserts that the surviving victim, Stephen Tuttle, recanted his testimony at trial that although he did not see who shot him, Petitioner was the only person who exited the car with him when he was shot.   Petitioner states that Tuttle now says he remembers that Butterfield also exited the

vehicle with them. Petitioner argues that this new evidence places Butterfield in such a position that he could have been the person who shot Tuttle, and therefore creates reasonable doubt that Petitioner shot Tuttle. He argues that this new evidence was sufficient to warrant a new trial under Florida law, and therefore the trial court erred in denying his motion for a new trial (Doc. 2, pp. 20-21).[9]

A petitioner can only obtain federal habeas relief if he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). Accordingly, a claim that raises no federal constitutional issue is not cognizable in a federal habeas petition. *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988). This claim is not cognizable on federal habeas review, as it raises only a state law issue for which federal jurisdiction does not lie. *See Wainwright v. Goode*, 464 U.S. 78, 83 (1983) ("[F]ederal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension."); *Barclay v. Florida*, 463 U.S. 939, 958-959 (1983) ("Mere errors of state law are not the concern of this court . . . unless they rise for some other reason to the level of a denial of rights protected by the United States Constitution.") (citations omitted).

In his reply, Petitioner asserts that he "properly presented this claim to the state court, who refused to hear it and allow Petitioner an opportunity to be heard. This violates Petitioner's basic federal rights of fairness and equal protection." (Doc. 30-2, docket p. 10). This is a claim of constitutional error in the state post-conviction review process, which is not cognizable on federal habeas review. *See Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1986) (claim that post-conviction court erred by not holding a hearing or attaching portions of the record to the

---

[9]Petitioner does not contend that Tuttle's new "testimony" establishes that he is actually innocent of the crime for which he was convicted.

order failed to state a cognizable habeas corpus claim); *Mitchell v. Wyrick*, 727 F.2d 773, 774 (8th Cir. 1984) ("Even where there may be some error in state post-conviction proceedings, this would not entitle appellant to federal habeas corpus relief since appellant's claim here represents an attack on a proceeding collateral to detention of appellant and not on the detention itself.") (quotation and citation omitted).

Accordingly, Ground Four does not warrant federal habeas relief.

**Ground Five**

Petitioner contends that he was denied due process and a fair and impartial jury, and the state trial court was without jurisdiction to proceed, because an oath was not properly administered to the jury panel. He asserts that although a bailiff administered an oath to the jury panel, the bailiff "had no authority whatsoever to administer oaths to jurors. . . ." He argues that without a "proper" oath, his trial "never officially commenced," the trial court lacked jurisdiction, all the proceedings are "null and void," and his right to "a fair trial by an impartial jury is reduced to nothing more than a hollow promise."

Petitioner raised this claim on appeal from his resentencing (Respondent's Ex. 10 - Initial Brief, pp. 17-24). The state appellate court affirmed without a written opinion (Respondent's Ex. 13). The state appellate court's denial of this claim was not contrary to clearly established federal law. Petitioner has failed to cite, and the court has been unable to locate, a case holding that the federal Constitution requires a trial court to swear a jury panel prior to voir dire, much less one holding that an oath given to a jury panel prior to voir dire is unconstitutional where administered by an individual not specifically authorized to do so under state law. *See, e.g., United States v. Turrietta*, 696 F.3d 972, 982 (10th Cir.2012) ("No federal court in the history of American jurisprudence has held the constitutional guarantee of trial by jury to necessarily

include trial by sworn jury."); *Robertson v. McKee*, 2012 U.S. Dist. LEXIS 10715, at *10 (E.D. Mich. Jan. 30, 2012) ("Petitioner has failed to show that the federal Constitution is violated where the trial court fails to swear a prospective jury pool prior to voir dire").

Moreover, Petitioner's assertion that the oath was inadequate to confer jurisdiction on the trial court because under Florida law the bailiff was not authorized to administer an oath to a jury panel fails to present a claim cognizable on federal habeas review. It is well established that habeas review does not lie for errors of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 385 (1991).

Finally, the court agrees with Respondent that to the extent Petitioner attempts to allege a federal due process violation, the claim is procedurally defaulted because he failed to fairly present such a claim to the state courts. When Petitioner raised this claim on appeal from his resentencing, he framed his argument only in terms of state law (Respondent's Ex. 10 - Initial Brief, pp. 17-24). He did not fairly present a federal constitutional violation. Because Petitioner did not alert the state appellate court that his claim was federal in nature, he did not satisfy the exhaustion requirement of § 2254.

Any future attempt to exhaust state remedies would be futile under Florida law, since Petitioner may not take a second appeal of his conviction. Therefore, any federal constitutional claim is procedurally defaulted. A procedural default may be excused through a showing of cause for the default and prejudice arising therefrom, *see Coleman*, 501 U.S. at 750, or a demonstration that failure to consider the claim will result in a "fundamental miscarriage of justice," *see Murray*, 477 U.S. at 495-96. Petitioner has failed to show he is entitled to federal review under either exception to the procedural bar.

Accordingly, Ground Five does not warrant federal habeas relief.

**Ground Six**

Petitioner complains that his "fundamental right to have the trial judge physically present at the trial" was violated because the judge was not present when the bailiff administered the oath to the jury panel. Petitioner raised this claim on appeal from his resentencing (Respondent's Ex. 10 - Initial Brief, pp. 25-29). The state appellate court affirmed without a written opinion (Respondent's Ex. 13).

The state appellate court's denial of this claim was not contrary to clearly established federal law. Petitioner has not cited any binding authority, and this Court is aware of none, from the United States Supreme Court holding that the issuance of the oath to the jury panel prior to voir dire is a critical stage of the trial during which the judge must be present. *See, e.g., Memminger v. People*, 2009 U.S. Dist. LEXIS 131080, at *29 (S.D.N.Y. Sept. 9, 2009) ("the judge must be present for 'substantive conduct of functional portions of the trial', but not for 'performance of mechanical repetitions.'") (quoting *United States v. Grant*, 52 F.3d 448, 450 (2d Cir. 1995)). Accordingly, Ground Six does not warrant federal habeas relief.

Any claims not specifically addressed herein have been determined to be without merit.

It is therefore **ORDERED AND ADJUDGED** as follows:

1. The Petition for Writ of Habeas Corpus (Doc. No. 1) is **DENIED**.

2. The Clerk of the Court shall enter judgment accordingly and close this case.

3. This Court should grant an application for certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. §

2253(c)(2).    Petitioner has failed to make this showing.[10] Accordingly, a Certificate of Appealability is **DENIED** in this case.    And because Petitioner is not entitled to a Certificate of Appealability, he is not entitled to proceed on appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida on March 25, 2020.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Petitioner, *pro se*
Counsel of Record

---

[10]The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.   *See* Rule 11 of the Rules Governing Section 2254 Cases In the United States District Courts.